INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN & HELPERS
OF AMERICA *v.* DANIEL

No. 77–753.  Argued October 31, 1978—Decided January 16, 1979*

*Together with No. 77–754, *Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, et al.* v. *Daniel,* also on certiorari to the same court.

552

POWELL, J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, BLACKMUN, and REHNQUIST, JJ., joined, and in all but the last paragraph of Part III-A of which, BURGER, C. J., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 570. STEVENS, J., took no part in the consideration or decision of the cases.

*Sidney Dickstein* argued the cause for petitioner in No. 77–753. With him on the briefs were *George Kaufmann* and *Bernard Weisberg*. *Sherman Carmell* argued the cause and filed briefs for petitioners in No. 77–754.

*Lawrence Walner* and *Peter J. Barack* argued the cause and filed a brief for respondent in both cases.

*Jacob H. Stillman* argued the cause for the Securities and Exchange Commission as *amicus curiae*. With him on the brief were *Harvey L. Pitt* and *Paul Gonson.*†

Mr. Justice Powell delivered the opinion of the Court.

This case presents the question whether a noncontributory, compulsory pension plan constitutes a "security" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934 (Securities Acts).

I

In 1954 multiemployer collective bargaining between Local 705 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America and Chicago trucking firms produced a pension plan for employees represented by the Local. The plan was compulsory and noncontributory. Employees had no choice as to participation in the plan, and did not have the option of demanding that the employer's contribution be paid directly to them as a substitute for pension eligibility. The employees paid nothing to the plan themselves.[1]

---

†Briefs of *amici curiae* urging reversal were filed by *William H. Smith, D. Bret Carlson,* and *Stephen R. Kroll* for the American Bankers Assn.; by *Stanley T. Kaleczyc* and *Robert W. Blanchette* for the Chamber of Commerce of the United States; by *Peter G. Nash* and *George J. Pantos* for the ERISA Industry Committee; and by *Paul S. Berger, Melvin Spaeth,* and *Gerald M. Feder* for the National Coordinating Committee for Multiemployer Plans.

Briefs of *amici curiae* urging affirmance were filed by *Bruce K. Miller* for the Gray Panthers; and by *Arthur L. Fox II* for PROD et al.

*Lawrence J. Latto* filed a brief for the American Academy of Actuaries as *amicus curiae*.

[1] For examples of other noncontributory, compulsory pension plans, see *Allied Structural Steel Co.* v. *Spannaus,* 438 U. S. 234, 236–237 (1978);

The collective-bargaining agreement initially set employer contributions to the Pension Trust Fund at $2 a week for each man-week of covered employment.[2]  The Board of Trustees of the Fund, a body composed of an equal number of employer and union representatives, was given sole authority to set the level of benefits but had no control over the amount of required employer contributions.  Initially, eligible employees received $75 a month in benefits upon retirement.  Subsequent collective-bargaining agreements called for greater employer contributions, which in turn led to higher benefit payments for retirees.  At the time respondent brought suit, employers contributed $21.50 per employee man-week and pension payments ranged from $425 to $525 a month depending on age at retirement.[3]  In order to receive a pension an employee was required to have 20 years of continuous service, including time worked before the start of the plan.

The meaning of "continuous service" is at the center of this dispute.  Respondent began working as a truckdriver in the Chicago area in 1950, and joined Local 705 the following year.  When the plan first went into effect, respondent automatically received 5 years' credit toward the 20-year service requirement because of his earlier work experience.

---

*Malone* v. *White Motor Corp.*, 435 U. S. 497, 500–501 (1978); *Alabama Power Co.* v. *Davis*, 431 U. S. 581, 590 (1977).

[2] Contributions were tied to the number of employees rather than the amount of work performed.  For example, payments had to be made even for weeks where an employee was on leave of absence, disabled, or working for only a fraction of the week.  Conversely, employers did not have to increase their contribution for weeks in which an employee worked overtime or on a holiday.  Trust Agreement, Art. 3, § 1, App. 62a.

[3] Because the Fund made the same payments to each employee who qualified for a pension and retired at the same age, rather than establishing an individual account for each employee tied to the amount of employer contributions attributable to his period of service, the plan provided a "defined benefit."  See 29 U. S. C. § 1002 (35); *Alabama Power Co.* v. *Davis, supra,* at 593 n. 18.

He retired in 1973 and applied to the plan's administrator for a pension. The administrator determined that respondent was ineligible because of a break in service between December 1960 and July 1961.[4] Respondent appealed the decision to the trustees, who affirmed. Respondent then asked the trustees to waive the continuous-service rule as it applied to him. After the trustees refused to waive the rule, respondent brought suit in federal court against the International Union (Teamsters), Local 705 (Local), and Louis Peick, a trustee of the Fund.

Respondent's complaint alleged that the Teamsters, the Local, and Peick misrepresented and omitted to state material facts with respect to the value of a covered employee's interest in the pension plan. Count I of the complaint charged that these misstatements and omissions constituted a fraud in connection with the sale of a security in violation of § 10 (b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j (b), and the Securities and Exchange Commission's Rule 10b-5, 17 CFR § 240.10b-5 (1978). Count II charged that the same conduct amounted to a violation of § 17 (a) of the Securities Act of 1933, 48 Stat. 84, as amended, 15 U. S. C. § 77q. Other counts alleged violations of various labor-law and common-law duties.[5] Respondent sought to proceed on

---

[4] Respondent was laid off from December 1960 until April 1961. In addition, no contributions were paid on his behalf between April and July 1961, because of embezzlement by his employer's bookkeeper. During this 7-month period respondent could have preserved his eligibility by making the contributions himself, but he failed to do so.

[5] Count III charged the Teamsters and the Local with violating their duty of fair representation under § 9 (a) of the National Labor Relations Act, 29 U. S. C. § 159 (a), and Count V (later amended as Count VI) charged the Teamsters, the Local, Peick, and all other Teamsters Pension Fund trustees with violating their obligations under § 302 (c) (5) of the Labor Management Relations Act, 29 U. S. C. § 186 (c) (5). Count IV accused all defendants of common-law fraud and deceit.

behalf of all prospective beneficiaries of Teamsters pension plans and against all Teamsters pension funds.[6]

The petitioners moved to dismiss the first two counts of the complaint on the ground that respondent had no cause of action under the Securities Acts. The District Court denied the motion. 410 F. Supp. 541 (ND Ill. 1976). It held that respondent's interest in the Pension Fund constituted a security within the meaning of § 2 (1) of the Securities Act, 15 U. S. C. § 77b (1), and § 3 (a)(10) of the Securities Exchange Act, 15 U. S. C. § 78c (a)(10),[7] because the plan created an "investment contract" as that term had been interpreted in *SEC* v. *W. J. Howey Co.*, 328 U. S. 293 (1946). It also determined that there had been a "sale" of this interest to respondent within the meaning of § 2 (3) of the Securities Act, as amended, 15 U. S. C. § 77b (3), and § 3 (a)(14) of the Securities Exchange Act, 15 U. S. C. § 78c (a)(14).[8] It

---

[6] As of the time of appeal to the Seventh Circuit the District Court had not yet ruled on any class-certification issues.

[7] Section 2 (1) of the Securities Act, as amended, 15 U. S. C. § 77b (1), defines a "security" as

"any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

The definition of a "security" in § 3 (a)(10) of the Securities Exchange Act is virtually identical and, for the purposes of this case, the coverage of the two Acts may be regarded as the same. *United Housing Foundation, Inc.* v. *Forman*, 421 U. S. 837, 847 n. 12 (1975); *Tcherepnin* v. *Knight*, 389 U. S. 332, 342 (1967).

[8] Section 2 (3) of the Securities Act provides, in pertinent part, that "[t]he term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value." Section 3 (a)(14) of

believed respondent voluntarily gave value for his interest in the plan, because he had voted on collective-bargaining agreements that chose employer contributions to the Fund instead of other wages or benefits.

The order denying the motion to dismiss was certified for appeal pursuant to 28 U. S. C. § 1292 (b), and the Court of Appeals for the Seventh Circuit affirmed. 561 F. 2d 1223 (1977). Relying on its perception of the economic realities of pension plans and various actions of Congress and the SEC with respect to such plans, the court ruled that respondent's interest in the Pension Fund was a "security." According to the court, a "sale" took place either when respondent ratified a collective-bargaining agreement embodying the Fund or when he accepted or retained covered employment instead of seeking other work.[9] The court did not believe the subsequent enactment of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, 29 U. S. C. § 1001 et seq., affected the application of the Securities Acts to pension plans, as the requirements and purposes of ERISA were perceived to be different from those of the Securities Acts.[10] We granted certiorari, 434 U. S. 1061 (1978), and now reverse.

the Securities Exchange Act states that "[t]he terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." Although the latter definition does not refer expressly to a disposition for value, the court below did not decide whether the Securities Exchange Act nevertheless impliedly incorporated the Securities Act definition, cf. n. 7, supra, as in its view respondent did give value for his interest in the pension plan. In light of our disposition of the question whether respondent's interest was a "security," we need not decide whether the meaning of "sale" under the Securities Exchange Act is any different from its meaning under the Securities Act.

[9] The Court of Appeals and the District Court also held that § 17 (a) of the Securities Act provides private parties with an implied cause of action for damages. In light of our disposition of this case, we express no views on this issue.

[10] Respondent did not have any cause of action under ERISA itself, as that Act took effect after he had retired.

II

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring); see *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 197, 199, and n. 19 (1976). In spite of the substantial use of employee pension plans at the time they were enacted, neither § 2 (1) of the Securities Act nor § 3 (a)(10) of the Securities Exchange Act, which define the term "security" in considerable detail and with numerous examples, refers to pension plans of any type. Acknowledging this omission in the statutes, respondent contends that an employee's interest in a pension plan is an "investment contract," an instrument which is included in the statutory definitions of a security.[11]

To determine whether a particular financial relationship constitutes an investment contract, "[t]he test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Howey,* 328 U. S., at 301. This test is to be applied in light of "the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties." *United Housing Foundation, Inc.* v. *Forman,* 421 U. S. 837, 851–852 (1975). Accord, *Tcherepnin* v. *Knight,* 389 U. S. 332, 336 (1967); *Howey, supra,* at 298. Cf. *SEC* v.

---

[11] Respondent also argues that his interest constitutes a "certificate of interest or participation in any profit-sharing agreement." The court below did not consider this claim, as respondent had not seriously pressed the argument and the disposition of the "investment contract" issue made it unnecessary to decide the question. 561 F. 2d 1223, 1230 n. 15 (CA7 1977). Similarly, respondent here does not seriously contend that a "certificate of interest . . . in any profit-sharing agreement" has any broader meaning under the Securities Acts than an "investment contract." In *Forman, supra,* we observed that the *Howey* test, which has been used to determine the presence of an investment contract, "embodies the essential attributes that run through all of the Court's decisions defining a security." 421 U. S., at 852.

*Variable Annuity Life Ins. Co.,* 359 U. S. 65, 80 (1959) (BRENNAN, J., concurring) ("[O]ne must apply a test in terms of the purposes of the Federal Acts . . ."). Looking separately at each element of the *Howey* test, it is apparent that an employee's participation in a noncontributory, compulsory pension plan such as the Teamsters' does not comport with the commonly held understanding of an investment contract.

## A. *Investment of Money*

An employee who participates in a noncontributory, compulsory pension plan by definition makes no payment into the pension fund. He only accepts employment, one of the conditions of which is eligibility for a possible benefit on retirement. Respondent contends, however, that he has "invested" in the Pension Fund by permitting part of his compensation from his employer to take the form of a deferred pension benefit. By allowing his employer to pay money into the Fund, and by contributing his labor to his employer in return for these payments, respondent asserts he has made the kind of investment which the Securities Acts were intended to regulate.

In order to determine whether respondent invested in the Fund by accepting and remaining in covered employment, it is necessary to look at the entire transaction through which he obtained a chance to receive pension benefits. In every decision of this Court recognizing the presence of a "security" under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security. See *Tcherepnin, supra* (money paid for bank capital stock); *SEC* v. *United Benefit Life Ins. Co.,* 387 U. S. 202 (1967) (portion of premium paid for variable component of mixed variable- and fixed-annuity contract); *Variable Annuity Life Ins. Co., supra* (premium paid for variable-annuity contract); *Howey, supra* (money paid for purchase, maintenance,

and harvesting of orange grove); *SEC* v. *C. M. Joiner Leasing Corp.*, 320 U. S. 344 (1943) (money paid for land and oil exploration). Even in those cases where the interest acquired had intermingled security and nonsecurity aspects, the interest obtained had "to a very substantial degree elements of investment contracts . . . ." *Variable Annuity Life Ins. Co., supra,* at 91 (BRENNAN, J., concurring). In every case the purchaser gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security.

In a pension plan such as this one, by contrast, the purported investment is a relatively insignificant part of an employee's total and indivisible compensation package. No portion of an employee's compensation other than the potential pension benefits has any of the characteristics of a security, yet these noninvestment interests cannot be segregated from the possible pension benefits. Only in the most abstract sense may it be said that an employee "exchanges" some portion of his labor in return for these possible benefits.[12] He surrenders his labor as a whole, and in return receives a compensation package that is substantially devoid of aspects resembling a security. His decision to accept and retain covered employment may have only an attenuated relationship, if any, to perceived investment possibilities of a future pension. Looking at the economic realities, it seems clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment.

Respondent also argues that employer contributions on his behalf constituted his investment into the Fund. But it is inaccurate to describe these payments as having been "on behalf" of any employee. The trust agreement used employee man-weeks as a convenient way to measure an employ-

---

[12] This is not to say that a person's "investment," in order to meet the definition of an investment contract, must take the form of cash only, rather than of goods and services. See *Forman, supra,* at 852 n. 16.

er's overall obligation to the Fund, not as a means of measuring the employer's obligation to any particular employee. Indeed, there was no fixed relationship between contributions to the Fund and an employee's potential benefits. A pension plan with "defined benefits," such as the Local's, does not tie a qualifying employee's benefits to the time he has worked. See n. 3, *supra*. One who has engaged in covered employment for 20 years will receive the same benefits as a person who has worked for 40, even though the latter has worked twice as long and induced a substantially larger employer contribution.[13] Again, it ignores the economic realities to equate employer contributions with an investment by the employee.

## B. Expectation of Profits From a Common Enterprise

As we observed in *Forman,* the "touchstone" of the *Howey* test "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." 421 U. S., at 852. The Court of Appeals believed that Daniel's expectation of profit derived from the Fund's successful management and investment of its assets. To the extent pension benefits exceeded employer contributions and depended on earnings from the assets, it was thought they contained a profit element. The Fund's trustees provided the managerial efforts which produced this profit element.

As in other parts of its analysis, the court below found an expectation of profit in the pension plan only by focusing on one of its less important aspects to the exclusion of its more significant elements. It is true that the Fund, like other holders of large assets, depends to some extent on earnings

---

[13] Under the terms of the Local's pension plan, for example, respondent received credit for the five years he worked before the Fund was created, even though no employer contributions had been made during that period.

from its assets. In the case of a pension fund, however, a far larger portion of its income comes from employer contributions, a source in no way dependent on the efforts of the Fund's managers. The Local 705 Fund, for example, earned a total of $31 million through investment of its assets between February 1955 and January 1977. During this same period employer contributions totaled $153 million.[14] Not only does the greater share of a pension plan's income ordinarily come from new contributions, but unlike most entrepreneurs who manage other people's money, a plan usually can count on increased employer contributions, over which the plan itself has no control, to cover shortfalls in earnings.[15]

The importance of asset earnings in relation to the other benefits received from employment is diminished further by the fact that where a plan has substantial preconditions to vesting, the principal barrier to an individual employee's realization of pension benefits is not the financial health of the fund. Rather, it is his own ability to meet the fund's eligibility requirements. Thus, even if it were proper to describe the benefits as a "profit" returned on some hypothetical investment by the employee, this profit would depend primarily on the employee's efforts to meet the vesting requirements, rather than the fund's investment success.[16] When viewed in light of the total compensation package an employee must receive in order to be eligible for pension benefits, it becomes clear that the possibility of participating in a plan's asset earnings "is far too speculative and insubstantial to bring the entire transaction within the Securities Acts," *Forman,* 421 U. S., at 856.

[14] In addition, the Fund received $7,500,000 from smaller pension funds with which it merged over the years.

[15] See Note, The Application of the Antifraud Provisions of the Securities Laws to Compulsory, Noncontributory Pension Plans After *Daniel* v. *International Brotherhood of Teamsters,* 64 Va. L. Rev. 305, 315 (1978).

[16] See Note, Interest in Pension Plans as Securities: *Daniel* v. *International Brotherhood of Teamsters,* 78 Colum. L. Rev. 184, 201 (1978).

## III

The court below believed that its construction of the term "security" was compelled not only by the perceived resemblance of a pension plan to an investment contract but also by various actions of Congress and the SEC with regard to the Securities Acts. In reaching this conclusion, the court gave great weight to the SEC's explanation of these events, an explanation which for the most part the SEC repeats here. Our own review of the record leads us to believe that this reliance on the SEC's interpretation of these legislative and administrative actions was not justified.

### A. Actions of Congress

The SEC in its *amicus curiae* brief refers to several actions of Congress said to evidence an understanding that pension plans are securities. A close look at each instance, however, reveals only that Congress might have believed certain kinds of pension plans, radically different from the one at issue here, came within the coverage of the Securities Acts. There is no evidence that Congress at any time thought noncontributory plans similar to the one before us were subject to federal regulation as securities.

The first action cited was the rejection by Congress in 1934 of an amendment to the Securities Act that would have exempted employee stock investment and stock option plans from the Act's registration requirements.[17] The amendment passed the Senate but was eliminated in conference. The legislative history of the defeated proposal indicates it was

---

[17] The amendment would have added the following language to § 4 (1) of the Securities Act:

"As used in this paragraph, the term 'public offering' shall not be deemed to include an offering made solely to employees by an issuer or by its affiliates in connection with a bona fide plan for the payment of extra compensation or stock investment plan for the exclusive benefit of such employees." 78 Cong. Rec. 8708 (1934).

intended to cover plans under which employees contributed their own funds to a segregated investment account on which a return was realized. See H. R.. Conf. Rep. No. 1838, 73d Cong., 2d Sess., 41 (1934); Hearings before the House Committee on Interstate and Foreign Commerce on Proposed Amendments to the Securities Act of 1933 and to the Securities Exchange Act of 1934, 77th Cong., 1st Sess., pt. 1, pp. 895–896 (1941). In rejecting the amendment, Congress revealed a concern that certain interests having the characteristics of a security not be excluded from Securities Act protection simply because investors realized their return in the form of retirement benefits. At no time, however, did Congress indicate that pension benefits in and of themselves gave a transaction the characteristics of a security.

The SEC also relies on a 1970 amendment of the Securities Act which extended § 3's exemption from registration to include "any interest or participation in a single or collective trust fund maintained by a bank . . . which interest or participation is issued in connection with . . . a stock bonus, pension, or profit-sharing plan which meets the requirements for qualification under section 401 of title 26, . . ." § 3 (a) (2) of the Securities Act, as amended, 84 Stat. 1434, 1498, 15 U. S. C. § 77c (a)(2). It argues that in creating a registration exemption, the amendment manifested Congress' understanding that the interests covered by the amendment otherwise were subject to the Securities Acts.[18] It interprets "interest or participation in a single . . . trust fund . . . issued in connection with . . . a stock bonus, pension, or profit-sharing plan" as referring to a prospective beneficiary's interest in a pension fund. But this construction of the 1970

---

[18] Section 17 (c) of the Securities Act, 15 U. S. C. § 77q (c), and § 10 (b) of the Securities Exchange Act, 15 U. S. C. § 78j (b) (when read with §§ 3 (a)(10) and (12) of that Act), indicate that the antifraud provisions of the respective Acts continue to apply to interests that come within the exemptions created by § 3 (a)(2) of the Securities Act and § 3 (a)(12) of the Securities Exchange Act.

amendment ignores that measure's central purpose, which was to relieve banks and insurance companies of certain registration obligations. The amendment recognized only that a pension plan had "an interest or participation" in the fund in which its assets were held, not that prospective beneficiaries of a plan had any interest in either the plan's bank-maintained assets or the plan itself.[19]

## B. SEC Interpretation

The court below believed, and it now is argued to us, that almost from its inception the SEC has regarded pension plans as falling within the scope of the Securities Acts. We are asked to defer to what is seen as a longstanding interpretation of these statutes by the agency responsible for their

---

[19] See S. Rep. No. 91–184, p. 27 (1969); Hearings before the Senate Committee on Banking and Currency on Mutual Fund Legislation of 1967, 90th Cong., 1st Sess., pt. 3, pp. 1341–1342 (1967); Mundheim & Henderson, Applicability of the Federal Securities Laws to Pension and Profit-Sharing Plans, 29 L. & Contemp. Probs. 795, 819–837 (1964); Saxon & Miller, Common Trust Funds, 53 Geo. L. J. 994 (1965). The SEC argues that the addition by the House of the language "single or" before "common trust fund" indicated an intent to cover the underlying plans that invested in bank-maintained funds. The legislative history, however, indicates that the change was meant only to eliminate the negative inference suggested by the unrevised language that banks would have to register the segregated investment funds they administered for particular plans. Because the provision as a whole dealt only with the relationship between a plan and its bank, the revision did not affect the registration status of the underlying pension plan. See 116 Cong. Rec. 33287 (1970). This was consistent with the SEC's interpretation of the provision. Hearings, *supra*, at 1326. The subsequent addition of another provision excepting from the exemption funds "under which an amount in excess of the employer's contribution is allocated to the purchase of securities . . . issued by the employer or by any company directly or indirectly controlling, controlled by or under common control with the employer" appears to have been simply an additional safeguard to confirm the SEC's authority to require such plans, and only such plans, to register. See H. R. Conf. Rep. No. 91–1631, p. 31 (1970).

administration. But there are limits, grounded in the language, purpose, and history of the particular statute, on how far an agency properly may go in its interpretative role. Although these limits are not always easy to discern, it is clear here that the SEC's position is neither longstanding nor even arguably within the outer limits of its authority to interpret these Acts.[20]

As we have demonstrated above, the type of pension plan at issue in this case bears no resemblance to the kind of financial interests the Securities Acts were designed to regulate. Further, the SEC's present position is flatly contradicted by its past actions. Until the instant litigation arose, the public record reveals no evidence that the SEC had ever considered the Securities Acts to be applicable to noncontributory pension plans. In 1941, the SEC first articulated the position that voluntary, contributory plans had investment characteristics that rendered them "securities" under the Acts. At the same time, however, the SEC recognized that noncontributory

---

[20] It is a commonplace in our jurisprudence that an administrative agency's consistent, longstanding interpretation of the statute under which it operates is entitled to considerable weight. *United States* v. *National Assn. of Securities Dealers*, 422 U. S. 694, 719 (1975); *Saxbe* v. *Bustos*, 419 U. S. 65, 74 (1974); *Investment Company Institute* v. *Camp*, 401 U. S. 617, 626–627 (1971); *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965). This deference is a product both of an awareness of the practical expertise which an agency normally develops, and of a willingness to accord some measure of flexibility to such an agency as it encounters new and unforeseen problems over time. But this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history. On a number of occasions in recent years this Court has found it necessary to reject the SEC's interpretation of various provisions of the Securities Acts. See *SEC* v. *Sloan*, 436 U. S. 103, 117–119 (1978); *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 41 n. 27 (1977); *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 212–214 (1976); *Forman*, 421 U. S., at 858 n. 25; *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 759 n. 4 (1975) (POWELL, J., concurring); *Reliance Electric Co.* v. *Emerson Electric Co.*, 404 U. S. 418, 425–427 (1972).

plans were not covered by the Securities Acts because such plans did not involve a "sale" within the meaning of the statutes. Opinions of Assistant General Counsel, [1941–1944 Transfer Binder] CCH Fed. Sec. L. Serv. ¶ 75,195 (1941); Hearings before the House Committee on Interstate and Foreign Commerce on Proposed Amendments to the Securities Act of 1933 and to the Securities Exchange Act of 1934, 77th Cong., 1st Sess., 895, 896–897 (1941) (testimony of Commissioner Purcell).[21]

In an attempt to reconcile these interpretations of the Securities Acts with its present stand, the SEC now augments its past position with two additional propositions. First, it is argued, noncontributory plans are "securities" even where a "sale" is not involved. Second, the previous concession that noncontributory plans do not involve a "sale" was meant to apply only to the registration and reporting requirements of the Securities Acts; for purposes of the antifraud provisions, a "sale" is involved. As for the first proposition, we observe that none of the SEC opinions, reports, or testimony cited to us address the question. As for the second, the record is unambiguously to the contrary.[22] Both in its 1941 statements

[21] Subsequent to 1941, the SEC made no further efforts to regulate even contributory, voluntary pension plans except where the employees' contributions were invested in the employer's securities. Cf. n. 19, *supra.* It also continued to disavow any authority to regulate noncontributory, compulsory plans. See letter from Assistant Director, Division of Corporate Finance, May 12, 1953, [1978] CCH Fed. Sec. L. Rep. ¶ 2105.51; letter from Chief Counsel, Division of Corporate Finance, Aug. 1, 1962, [1978] CCH Fed. Sec. L. Rep. ¶ 2105.52; Hearings before the Senate Committee on Banking and Currency, *supra* n. 19, at 1326; 1 L. Loss, Securities Regulation 510–511 (2d ed. 1961); 4 *id.,* at 2553–2554 (2d ed. 1969); Hyde, Employee Stock Plans and the Securities Act of 1933, 16 W. Res. L. Rev. 75, 86 (1964); Mundheim & Henderson, *supra* n. 19, at 809–811; Note, Pension Plans as Securities, 96 U. Pa. L. Rev. 549, 549–551 (1948).

[22] On occasion the SEC has contended that because § 2 of the Securities Act and § 3 of the Securities Exchange Act apply the qualifying phrase "unless the context otherwise requires" to the Acts' general definitions, it

and repeatedly since then, the SEC has declared that its "no sale" position applied to the Securities Acts as a whole. See opinions of Assistant General Counsel, [1941–1944 Transfer Binder] CCH Fed. Sec. L. Serv. ¶ 75,195, p. 75,387 (1941); Hearings before the House Committee on Interstate and Foreign Commerce, *supra,* at 888, 896–897; Institutional Investor Study Report of the Securities and Exchange Commission, H. R. Doc. No. 92–64, pt. 3, p. 996 (1971) ("[T]he Securities Act does not apply . . ."); Hearings before the Subcommittee on Welfare and Pension Funds of the Senate Committee on Labor and Public Welfare on Welfare and Pension Plans Investigation, 84th Cong., 1st Sess., pt. 3, pp. 943–946 (1955). Congress acted on this understanding when it proceeded to develop the legislation that became ERISA. See, *e. g.,* Interim Report of Activities of the Private Welfare and Pension Plan Study, 1971, S. Rep. No. 92–634, p. 96 (1972) ("Pension and profit-sharing plans are *exempt from coverage* under the Securities Act of 1933 . . . unless the plan is a voluntary con-

---

is permissible to regard a particular transaction as involving a sale or not depending on the form of regulation involved. See 1 L. Loss, Securities Regulation 524–528 (2d ed. 1961); 4 *id.,* at 2562–2565 (2d ed. 1969). The Court noted the contention in *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 465–466 (1969). On previous occasions the SEC appears to have taken a different position: In 1943 it submitted an *amicus* brief in the Ninth Circuit arguing that a transaction must be a sale for all purposes of the Securities Act or for none, and it did not begin to rely on its "regulatory context" theory until 1951. See Brief for the SEC in *National Supply Co.* v. *Leland Stanford Junior University,* No. 10270 (CA9 Apr. 1, 1943); 1 L. Loss, *supra,* at 524 n. 211; Cohen, Rule 133 of the Securities and Exchange Commission, 14 Record of N. Y. C. B. A. 162, 164–165 (1959). We also note that, with respect to statutory mergers, the area in which the SEC originally developed its theory as to the bifurcated definition of a sale, the SEC since has abandoned its position and finds the presence of a "sale" for all purposes in the case of such mergers. See 17 CFR § 230.145 (1978). In view of our disposition of this case, we express no opinion as to the correct resolution of the divergent views on this issue.

tributory pension plan and invests in the securities of the employer company an amount greater than that paid into the plan by the employer") (emphasis added). As far as we are aware, at no time before this case arose did the SEC intimate that the antifraud provisions of the Securities Acts nevertheless applied to noncontributory pension plans.

## IV

If any further evidence were needed to demonstrate that pension plans of the type involved are not subject to the Securities Acts, the enactment of ERISA in 1974, 88 Stat., 829, would put the matter to rest. Unlike the Securities Acts, ERISA deals expressly and in detail with pension plans. ERISA requires pension plans to disclose specified information to employees in a specified manner, see 29 U. S. C. §§ 1021–1030, in contrast to the indefinite and uncertain disclosure obligations imposed by the antifraud provisions of the Securities Acts, see *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 474–477 (1977); *TSC Industries, Inc.* v. *Northway, Inc.,* 426 U. S. 438 (1976). Further, ERISA regulates the substantive terms of pension plans, setting standards for plan funding and limits on the eligibility requirements an employee must meet. For example, with respect to the underlying issue in this case—whether respondent served long enough to receive a pension—§ 203 (a) of ERISA, 29 U. S. C. § 1053 (a), now sets the minimum level of benefits an employee must receive after accruing specified years of service, and § 203 (b), 29 U. S. C. § 1053 (b), governs continuous-service requirements. Thus, if respondent had retired after § 1053 took effect, the Fund would have been required to pay him at least a partial pension. The Securities Acts, on the other hand, do not purport to set the substantive terms of financial transactions.

The existence of this comprehensive legislation governing the use and terms of employee pension plans severely undercuts all arguments for extending the Securities Acts to non-

contributory, compulsory pension plans. Congress believed that it was filling a regulatory void when it enacted ERISA, a belief which the SEC actively encouraged. Not only is the extension of the Securities Acts by the court below unsupported by the language and history of those Acts, but in light of ERISA it serves no general purpose. See *Califano* v. *Sanders,* 430 U. S. 99, 104–107 (1977). Cf. *Boys Markets, Inc.* v. *Retail Clerks,* 398 U. S. 235, 250 (1970). Whatever benefits employees might derive from the effect of the Securities Acts are now provided in more definite form through ERISA.

V

We hold that the Securities Acts do not apply to a noncontributory, compulsory pension plan. Because the first two counts of respondent's complaint do not provide grounds for relief in federal court, the District Court should have granted the motion to dismiss them. The judgment below is therefore

*Reversed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of these cases.

MR. CHIEF JUSTICE BURGER, concurring.

I join in the opinion of the Court except as to the discussion of the 1970 amendment to § 3 (a)(2) of the Securities Act. There is no need to deal, in this case, with the scope of the exemption, since it is not an issue presented for decision.

The Commission argues that the new exemption from the registration requirement of the Act applies to participation in a pension plan, and infers that Congress must have understood that such participation is a security which otherwise would be subject to the Act. It is not necessary to evaluate the Commission's interpretation of the exemption, however, because even if it is correct, it does not support the conclusion the Commission draws.

First, the inference concerning Congress' understanding of the Act in 1970 is tenuous. The language of the amendment covers a variety of financial interests, some of which clearly are "securities" as defined in the Act. Congress most likely acted with a view to those interests, without considering other financial interests like those involved here, for which registration never had been required.

Second, even if a draftsman concerned with exempting a variety of interests from the registration requirement may have believed, in 1970, that certain pension interests were within the statutory definition of "security," that would have little, if any, bearing on this case. At issue here is the construction of definitions enacted in 1933 and 1934.

The briefs suggest that the construction of the 1970 amendment may be problematic. The scope of the exemption may be of real importance to someone in some future case—but it is not so in connection with this action. Accordingly, I reserve any expression of views on the issue at this time.