O'Neal MILLS, Sr., Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, McDermott, Inc., & Crawford and Company, Respondents.

No. 87–4464.

United States Court of Appeals,
Fifth Circuit.

July 14, 1989.

land-based welder injured while building an offshore oil platform in Amelia, Louisiana, qualifies for benefits under the Longshore & Harbor Workers' Compensation Act (LHWCA) as incorporated in the Outer Continental Shelf Lands Act (OCSLA). Because we conclude that OCSLA's provision adopting LHWCA includes a situs of injury requirement that Mills did not satisfy, we affirm the order of the Benefits Review Board (BRB) rejecting Mills' claim.

## I.

McDermott, Inc., employed Mills as a welder in February 1982 when he suffered an injury during construction of an oil production platform destined for the outer Continental Shelf. The injury occurred in McDermott's yard in Amelia, Louisiana, where Mills had been working on the platform for at least six months before the accident. Mills performed all of his welding work for McDermott on land.

The deputy commissioner of the Office of Workers' Compensation Programs initially approved Mills' application for LHWCA benefits under OCSLA, 43 U.S.C. § 1333(b). An administrative law judge reversed the deputy commissioner's decision. The Benefits Review Board for the U.S. Department of Labor affirmed the ALJ's denial of benefits, and Mills appealed to this court.

In *Mills v. Director, OWCP*, 846 F.2d 1013 (5th Cir.1988), a panel of this court reversed the BRB and remanded. The court granted McDermott's petition for rehearing en banc on September 9, 1988. We now affirm the BRB's order and hold that Mills does not qualify for benefits under OCSLA because he does not satisfy its situs-of-injury requirement.

## II.

Section 1333(b) of OCSLA extends the LHWCA's benefits to employees disabled or killed "as the result of operations conducted on the outer Continental Shelf for the purposes of exploring for ... [or] developing ... the natural resources ... of

Lawrence A. Arcell and Barker, Boudreaux, Lamy & Foley, New Orleans, La., for petitioner.

John J. Weigel, and John Gomila, New Orleans, La., for amicus Avondale.

Maurice C. Hebert, Jr. and Alan G. Brackett, New Orleans, La., for amicus Petroleum.

Joseph W. Looney, Michael R.C. Riess and House, Looney, Golden, Kingsmill & Riess, New Orleans, La., for McDermott & Grawford.

Joshua T. Gillelan, II, Washington, D.C., for Director, OWCP, U.S. Dept. of Labor.

James F. Holmes, Christovich & Kearney, New Orleans, La., for amicus, Brown & Root and Gulf Marine.

Darrel E. Reed, Jr., E. John Gorman, James E. Doyle, Houston, Tex., for amicus curiae, American Petroleum Inst., et al.

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH and DUHE, Circuit Judges.[*]

W. EUGENE DAVIS, Circuit Judge:

We granted rehearing en banc to determine whether appellant, O'Neal Mills, a

[*] Judge King did not participate in this decision.

the subsoil and seabed of the outer Continental Shelf." As incorporated in OCSLA, § 933(i) of the LHWCA provides the exclusive remedy of an injured employee against his employer. See 33 U.S.C. § 933(i); *Barger v. Petroleum Helicopters, Inc.*, 692 F.2d 337, 339 (5th Cir.1982).

McDermott argues that Mills falls outside the reach of § 1333(b) because his injury occurred on Louisiana soil rather than on the outer Continental Shelf. The panel interpreted § 1333(b) as extending LHWCA coverage to oilfield workers so long as their injury had the necessary connection with operations on the OCS, without regard to where the injury occurred. *Mills*, 846 F.2d at 1015. Thus, the panel concluded that Mills qualified for workers' compensation benefits under OCSLA because (1) he would not have been injured but for operations on the OCS; and (2) his welding work during platform construction " 'furthered the operation of a fixed rig on the shelf and ... [occurred] in the regular course of extractive operations on the shelf.' " Id. (quoting *Herb's Welding, Inc. v. Gray*, 766 F.2d 898, 900 (5th Cir. 1985)).

### III.

### A.

■ In determining the Congressional intent behind § 1333(b) we follow the Supreme Court's teaching to interpret the legislation "... in light of the language of the Act as a whole, the legislative history [and] the Congressional purposes underlying the Act...." *Offshore Logistics v. Tallentire*, 477 U.S. 207, 221, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986).

Congress enacted OCSLA in 1953 to establish the law governing conduct on the Outer Continental Shelf, an area of intense activity that lacked an established legal system because it lies beyond state boundaries. Congress enacted OCSLA "to define a body of law applicable to the seabed, the subsoil, and the fixed structures ... on the Outer Continental Shelf." *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 355, 89 S.Ct. 1835, 1837, 23 L.Ed.2d 360 (1969); 43 U.S.C. § 1333(a). To that end Congress made non-maritime federal law applicable to the subsoil, seabed, and platforms. Id. at 355-56, 89 S.Ct. at 1837. In the event no federal law existed on a particular issue, Congress elected to borrow the adjacent state's law as surrogate federal law. Id.; 43 U.S.C. § 1333(a)(2)(A).

One obvious void in the law governing the OCS was the lack of a workers' compensation scheme for thousands of workers employed in the dangerous oilfield extraction industry. Congress filled that void in § 1333(b) when it adopted the LHWCA's benefits provision to cover non-seamen employed in the oil patch on the OCS.

Consistent with our interpretation of § 1333(b), none of § 1333's other subsections purport to apply beyond the OCS. Section 1333(a), which establishes the Shelf's substantive law, applies only to activity that occurs on the OCS.[1] Subsection (c) applies the National Labor Relations Act to unfair labor practices on OCS platforms.[2] Subsection (d) delegates to the Coast Guard the duty of promoting safety on the artificial islands and adjacent waters on the outer Continental Shelf.[3] Subsection (e) extends the Secretary of the Army's authority to prevent obstruction of

---

1. "The Constitution and laws ... of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed ... for the purpose of ... developing ... resources therefrom." 43 U.S.C. § 1333(a)(1); *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835.

2. "[A]ny unfair labor practice, as defined in [the NLRA], occurring upon any artificial island, installation, or other device referred to in sub-

section (a) ... shall be deemed to have occurred within the judicial district of the State...." 43 U.S.C. § 1333(c).

3. "The Secretary of the Department in which the Coast Guard is operating shall have authority to promulgate and enforce such reasonable regulations ... relating to the promotion of safety of life and property on the artificial islands ... referred to in subsection (a) ... or on the waters adjacent thereto...." 43 U.S.C. § 1333(d)(1).

navigation to those artificial islands,[4] while subsection (f) also focuses on certain legal provisions that apply to these same installations.[5]

These subsections demonstrate that Congress intended to regulate the OCS, not those areas that already were governed by state law. Neither Mills nor the Director of the Office of Workers' Compensation identifies any legislative history suggesting that Congress intended to single out OCSLA's workers' compensation scheme for different treatment. Nor do they suggest why Congress would have wanted to create another layer of compensation coverage for select shorebound employees—such as factory and shipyard laborers—who fortuitously work on equipment destined for offshore platforms.

Section 1333(b)'s bare language does not resolve the issue because the phrase "[injured] as the result of *operations* conducted on the outer Continental Shelf for the purpose of ... developing ... the natural resources ... of the [OCS]" is open to interpretation (emphasis added).

Mills and the Director read "operations" broadly to encompass work by employees—wherever located—provided their work furthers OCS mineral extraction activity in some significant way. But under an equally plausible reading of § 1333(b), coverage requires that the relevant "operations" out of which the injury arises occur on the OCS. We interpret § 1333(b) to require that covered operations be (1) related to OCS development; and (2) conducted on the OCS. Given the second requirement, activity conducted off the OCS, even though related to OCS mineral extraction, does not satisfy § 1333(b).

**4.** "The authority of the Secretary of the Army ... is hereby extended to the artificial islands, installations, and other devices referred to in subsection (a)...." 43 U.S.C. § 1333(e).

**5.** The specific application by this section of certain provisions of law to the subsoil and seabed of the outer Continental Shelf and the artificial islands, installations, and other devices referred to in subsection (a) ... shall not give rise to any inference that the application ... of any other provision of law is not intended." 43 U.S.C. § 1333(f).

Legislative history from OCSLA and a related bill, the Submerged Lands Act, 43 U.S.C. § 1301 et seq., supports the narrower reading of § 1333(b). OCSLA vested control of the OCS beyond state territorial waters in the federal government; the Submerged Lands Act certified state control over the water and seabed within state boundaries. OCSLA originated as Subchapter III of the Submerged Lands Act; the act retained its focus on "only the area of the Outer Continental Shelf beyond State boundaries" when Congress enacted it as a separate bill. 99 Cong.Rec. 6962 (Daily ed. June 22, 1953) (statement of Senator Cordon, acting chairman of the Senate Committee on Interior and Insular Affairs). The legislative history explains that these two bills were "legislatively joined"—even as they focused individually on separate areas of the ocean floor—by a Congress determined to draw a clear boundary between areas of federal and state control. See id.[6]

OCSLA's separate legislative history confirms this exclusive focus. In one exchange involving S. 1901, the bill that became OCSLA, the senators concluded that state workers' compensation would cover a worker in state waters drilling a slant hole into the OCS. Outer Continental Shelf: Hearings on S. 1901 before Senate Comm. on Interior and Insular Affairs, 83d Cong., 1st Sess., 12–16 (1953). The senators agreed that the place of injury controls the application of benefits. As the legislative history makes plain, Congress enacted OCSLA only as a vehicle to fill voids in the rules governing the federally managed territory of the OCS. No such void exists for disputes encompassing areas already governed by state law.

**6.** "Thus, S. 1901 is legislatively joined with the Submerged Lands Act, just as the areas with which each measure deals are joined geographically and geologically. Politically they are, of course, properly separated, since the Submerged Lands Act deals with lands within State boundaries, while [S. 1901] ... concerns itself with the areas seaward of such boundaries." 99 Cong. Rec. 6962 (Daily ed. June 22, 1953) (statement of Senator Cordon, acting chairman of the Senate Committee on Interior and Insular Affairs).

Mills and the Director seek support for their expansive reading of § 1333(b) in Congress' deletion of a proviso to Section 4(c) of S. 1901, the section that ultimately became § 1333(b). Section 4(c) originally extended LHWCA benefits to workers killed or disabled as the result of operations conducted on the OCS "if recovery for such disability or death through workmen's compensation proceedings is not provided by state law." They reason that the proviso's deletion signals Congress' intention to extend LHWCA benefits without regard to whether state workers' compensation schemes also applied.

Congress' explanation of the deletion does not support this interpretation. As the Committee Report explains,

> It was deemed inadvisable to have the Federal Longshoremen's and Harbor Workers' Compensation Act apply only if there is no applicable state law. By this amendment, *all workers on the Outer Shelf* not already protected under laws respecting seamen are protected by the Longshoremen's and Harbor Workers' Compensation Act.

S.Rep. No. 411, 83d Cong., 1st Sess. 16, 23 (1953) (emphasis added). Presumably, such a proviso would have foreclosed LHWCA benefits coverage for OCS platform employees when adjacent states extend their workers' compensation schemes to those platforms. See, e.g., *Thompson v. Teledyne Movible Offshore, Inc.*, 419 So.2d 822 (La.1982), *appeal dismissed*, 464 U.S. 802, 104 S.Ct. 48, 78 L.Ed.2d 69 (1983). The reference to OCS workers indicates that, at most, Congress was prepared to tolerate overlapping federal and state workers' compensation coverage on the OCS itself. But the proviso's deletion does not justify overlapping coverage for employees whose feet are planted firmly on state soil. Such a reading ignores OCSLA's gap-filling nature because it assumes that Congress legislated to provide law for an area already governed by state workers' compensation law.

Nor does § 1331(*l*)'s definition of "development" bolster the case for Mills' and the Director's interpretation.[7] Although the term as defined includes platform construction and onshore support facilities, the circumstances under which this definition emerged demonstrate that Congress did not intend to alter the scope of § 1333(b)'s coverage language.

Congress added § 1331(*l*) when it amended OCSLA in 1978 to revamp OCS leasing and development. In an effort to create a two-step process to separate (1) federal approval of offshore exploration and (2) federal approval for development of the discovered resources, Congress required lessees to submit detailed development and production plans to the Secretary of the Interior. 43 U.S.C. § 1351; *see* Report of the Senate Comm. on Energy and Natural Resources, 95th Cong., 1st Sess. 43, 82 (1977).

Lessees cannot begin "production" until the Department of the Interior and the affected states have approved the development and production plan. Id. Congress defined exploration, development and production "to identify the point, after exploration and before development, beyond which activity cannot proceed without an approved development and production plan, as described in [§ 1351]." H.R.Rep. No. 1984, 94th Cong., 2d Sess. 82 (1976); H.R. Rep. No. 590, 95th Cong., 1st Sess. 126 (1977), *reprinted in* 1978 U.S.Cong. & Admin.News 1450, at 1532.

---

**7.** Although nominally a respondent in this action, the Director supports Mills' contention and argued on his behalf at oral argument. We note, however, that the Director's interpretation of § 1333(b) is not conclusive. As this court noted in reference to agency interpretation of an enabling statute, "[D]eference to an agency's interpretation of its statute is limited by the court's obligation 'to honor the clear meaning of the statute, as revealed by its language, purpose and history,' ... and by the requirement that the agency interpretation not be clearly wrong or unreasonable." *Coca–Cola Co. v. Atcheson, Topeka & Santa Fe Ry. Co.*, 608 F.2d 213, 222 (5th Cir.1979) quoting *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 880 n. 20, 58 L.Ed.2d 808 (1979). As explained in the text, we find the Director's interpretation of § 1333(b) erroneous.

Thus, in § 1331(*l*) Congress crafted a special meaning for a general word, "development," as part of a comprehensive scheme to regulate OCS drilling. We reject Mills' and the Director's efforts to apply this definition in a workers' compensation context that bears no relation to the purpose for which Congress defined the word. The essential message of OCSLA's legislative history remains undiluted: Congress adopted § 1333(b) in the course of building a body of law for the OCS. This effort did not encompass already-regulated workers on state soil.

### B.

The Supreme Court has recognized the geographic boundaries to OCSLA's coverage in two recent cases. In *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986), the Court strictly construed § 1333(a)'s situs restriction and held that it did not extend state law to cover OCS platform workers who died in a helicopter crash on the high seas. In applying the Death on the High Seas Act rather than state law under OCSLA, the Court stressed that OCSLA "provides an essentially non-maritime remedy" and controls only on the OCS. Id. at 217, 106 S.Ct. at 2492. The Court continued, "Congress determined that the general scope of OCSLA's coverage, like the operation of DOHSA's remedies, would be determined principally by locale, not the status of the individual injured or killed." Id. at 219, 106 S.Ct. at 2493.

The Court followed this discussion of § 1333(a)'s coverage with a comparison to § 1333(b). The Court states, "Only [§ 1333(b)] ... *superimposes* a status requirement on the otherwise determinative OCSLA situs requirement...." Id. at 219 n. 2, 106 S.Ct. at 2493 n. 2 (emphasis added). We cannot accept the Director's explanation that the Court meant to "replace" situs with status when it used "superimposes." The Court could not have made it clearer that a worker must demonstrate status and situs to recover LHWCA benefits under § 1333(b).

*Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 427, 105 S.Ct. 1421, 1429, 84 L.Ed.2d 406 (1985) supports this conclusion. In that case the Court considered whether a worker injured on a production platform in Louisiana waters was entitled to recover LHWCA benefits. After concluding that the claimant's failure to meet the LHWCA's status test precluded direct LHWCA coverage, the Court remanded to the Fifth Circuit for a determination of whether OCSLA extended coverage to the claimant. In responding to an argument that denying LHWCA coverage would create "checkered coverage" the Court states,

> [T]he inconsistent coverage here results primarily from the *explicit geographical limitation* to the Lands Act's incorporation of the LHWCA.... Congress' desire to make LHWCA coverage uniform reveals little about the position of those for whom partial coverage results from a separate statute. This is especially true because *that statute draws a clear geographical boundary* that will predictably result in workers moving in and out of coverage.

Id. at 427, 105 S.Ct. at 1429 (emphasis added).

The Director argues that we imposed no situs requirement for § 1333(b) coverage in *Barger v. Petroleum Helicopters, Inc.,* 629 F.2d 337 (5th Cir.1982), and *Stansbury v. Sikorski Aircraft,* 681 F.2d 948 (5th Cir.), cert. denied *sub nom. Stansbury v. Chevron U.S.A., Inc.,* 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982). The Director's reliance on those cases is misplaced.

*Barger* and *Stansbury* held that § 1333(b) extended the LHWCA as the sole remedy for survivors suing the employers of individuals who (1) satisfied the "but for" status test; and (2) died in helicopter crashes on the high seas above the OCS. Although some of the dicta in those opinions may be overly broad, we have no quarrel with those holdings to the extent they grant LHWCA benefits to oilfield workers injured on waters above the OCS. We do not interpret those cases to read § 1333(b) as extending LHWCA benefits to oilfield workers injured on land or state territorial

waters. But cf. *Curtis v. Schlumberger Offshore Service, Inc.*, 849 F.2d 805 (3d Cir.1988) (Section 1333(b) covers OCS platform worker injured in car accident on New Jersey Garden State Parkway while driving to meet helicopter that would have flown him to rig).

### IV.

Given that Congress intended to establish a bright-line geographic boundary for § 1333(b) coverage, we now draw that line. We hold that LHWCA coverage as extended under § 1333(b) applies to employees who (1) suffer injury or death on an OCS platform or the waters above the OCS; and (2) satisfy the "but for" status test this court described in *Herb's Welding, Inc. v. Gray*, 766 F.2d 898, 900 (5th Cir.1985). As a land-based worker injured on Louisiana soil, Mills must look to state compensation laws for his benefits.

This interpretation is compelling in light of Congress' objective: filling voids in the law governing mineral extraction on the OCS. Moreover, we find it difficult to imagine that Congress intended to create the enormous problems that an expansive definition of § 1333(b)'s scope would entail.

Mills' interpretation of § 1333(b) requires us to assume that Congress intended to impose an additional layer of compensation coverage for shoreside workers employed by manufacturers and suppliers of equipment destined for offshore oil platform. Under such a scheme, an employee injured while working on equipment destined for the OCS receives more generous benefits than the employee next to him who suffers an injury building similar equipment destined for land-based uses. To cover this exposure, employers who assign even a small percentage of their employees to constructing, servicing or repairing equipment destined for offshore platforms would have no choice but to purchase insurance coverage for liability under both the state and federal compensation acts. Mills points to no evidence indicating that Congress intended to create such a cumbersome and uncertain compensation scheme or that it intended to intrude in a significant way on established state workers' compensation programs.

The plain words of § 1333(b), when read in light of the legislative history of OCSLA and the Congressional purpose underlying its enactment, impose a situs requirement for LHWCA coverage. The Benefit Review Board's order rejecting Mills' claim is therefore

AFFIRMED.

DUHE, Circuit Judge, with whom POLITZ and JERRE S. WILLIAMS, Circuit Judges, join, dissenting:

For the reasons set out in the panel opinion, *Mills v. Director, O.W.C.P., U.S. Dept. of Labor*, 846 F.2d 1013 (5th Cir. 1988), and those which follow, I respectfully disagree with the majority's determination that 43 U.S.C. § 1333(b) contains a situs requirement.

In interpreting § 1333(b), we must first look to its plain language in order to determine whether Congress intended that it cover off-shelf injuries. *See Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 2495, 91 L.Ed.2d 174 (1986); *U.S. v. Leonard*, 868 F.2d 1393, 1395 (5th Cir.1989) (*citing United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)). "If the statutory language is unambiguous, in the absence of a 'clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *Id.*

Section 1333(b) is not ambiguous in its lack of a situs requirement. By extending coverage to employees "injured *as the result of* operations conducted on the outer Continental Shelf for the purpose of ... developing ... the natural resources ... of the [OCS]" (emphasis added), Congress did not limit coverage to injuries occurring on the shelf itself. The majority finds that existence of an explicit geographical limitation in other § 1333 subsections justifies inclusion of such limitation in subsection (b). I find its absence in subsection (b) argues more strongly for the opposite result. *See U.S. v. West of England Ship Owner's Mut. Prot.*, 872 F.2d 1192, 1196

(1989) (court will not read in negligence standard to § 1321(f)(1) of Federal Water Pollution Control Act when Congress expressly used term "negligent" in other parts of § 1321). Certainly, Congress knows how to include a situs requirement in a statute when it intends that such a requirement should exist.[1] *See, e.g.,* Longshore and Harbor Workers Compensation Act, 33 U.S.C. § 903(a) (applies to "injury occurring *upon* the navigable waters of the United States ...") (emphasis added).

Finding no ambiguity in the language of § 1333(b), I believe that the majority erroneously relies on legislative history to find a situs requirement. Courts are bound to give effect to the literal meaning of a statute without consulting other indicia of intent or meaning when the meaning of the statutory text itself is unambiguous. 2A N. Singer, *Sutherland Stat. Const.* 86–87 (4th Ed.1984) (citations omitted).

Nevertheless, when legislative history is examined in an attempt to discern legislative intent it must be used with great caution. *United States v. Smith,* 795 F.2d 841 (9th Cir.1986); *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987). Mr. Justice Scalia concurring in *Blanchard v. Bergeron,* —— U.S. ——, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) warned against according legislative force to committee reports as follows:

> It is neither compatible with our judicial responsibility of assuring reasoned, consistent and effective application of the statutes of the United States, nor conducive to a genuine effectuation of congressional intent, to give legislative force to each snippet of analysis, and even every case citation, in committee reports that are increasingly unreliable evidence of what the voting Members of Congress actually had in mind.

Even if it is conceded, as the majority holds, that § 1333(b) standing alone is not absolutely clear, the isolated passages from the legislative history relied on by the majority do not amount to a contrary clearly expressed legislative intent. *See Curtis v. Schlumberger Offshore Service, Inc.,* 849 F.2d 805, 809 (3rd Cir.1988) (legislative history not helpful). For example, in the slant drilling hypothetical referred to by the majority, even if the Senate Committee believed that OCS drilling from state territorial waters would be covered by state law, that does not exclude the possibility of the co-applicability of the LHWCA and state compensation law to workers involved in constructing rigs bound for the OCS. *See Sun Ship Inc. v. Commonwealth of Pennsylvania, et al.,* 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980) (LHWCA contemplates federal and state concurrent jurisdiction); *Thompson v. Teledyne Movible Offshore, Inc.,* 419 So.2d 822 (La.1982) (in Louisiana, state and federal compensation schemes are complimentary). Equally as plausible as the majority's position that Congress meant to exclude shoreside workers from coverage is a conclusion that Congress intended to provide workers such as Mills the "very favorable" compensation remedy of the LHWCA irrespective of the concurrent applicability of state compensation laws. *See Outer Continental Shelf: Hearings on S–1901 before Senate Comm. on Interior and Insular Affairs,* 83d Cong., 1st Sess. 32 (1953).

Our jurisprudence applying § 1333(b) to injuries occurring "as a result of" operations on the OCS has been developing since 1973. In *Nations v. Morris,* 483 F.2d 577 (5th Cir.), *cert. denied,* 414 U.S. 1071, 94 S.Ct. 584, 38 L.Ed.2d 477 (1973), we said:

> OCSLA, in its incorporation of [the LHWCA], did not speak in terms of injuries occurring on such platforms so as to distinguish them from those off the platforms. The incorporation, § 1333(c), ... refers to "operations described in subsection (b)...." Obviously Congress purposefully established a system that would apply without regard to physical location.

---

1. In order to include a situs requirement, Congress could have written § 1333(b) to cover "disability or death of an employee resulting from any injury occurring on the outer Continental Shelf ..." or "... disability or death of an employee resulting from any injury occurring on the outer Continental Shelf as a result of operations conducted on the Shelf...."

*Id.* at 584. In the House Conference Report on the 1978 amendments to § 1333(b), Congress stated that "[t]his amendment involves no change in existing law. It was not the intent ... to alter in any way the existing coverage of the Longshoremen's Act, nor of other remedies ... for injuries or death." *Curtis,* 849 F.2d at 809 (*citing House Conference Report* at 81; 1978 U.S. Code Cong. & Admin.News at 1680). Congress may or may not have been aware of the developing case law surrounding § 1333(b); nevertheless, the amendments failed to address our expansive reading of the statute. *Id.*

It may well be true that when the purpose of § 1333(b) as seen by the majority is considered, the statute may have been more broadly drawn than it should have been. However, correction of that situation, if indeed it exists, is a legislative matter, not a judicial one. Accordingly, I respectfully dissent.

RUBIN and JOHNSON, Circuit Judges, dissent for the reasons set forth in the panel opinion, 846 F.2d 1013.