The **PEORIA UNION STOCK YARDS COMPANY, a Kentucky Corporation; the Peoria Union Stock Yards Company Retirement Plan, an employee pension benefit plan; H. Foster Embry, Ainslie E. Tyler, Harry W. Embry, Jr., and Eldon J. Waldron, as Trustees of The Peoria Union Stock Yards Company Retirement Plan; and, H. Foster Embry, H. Foster Embry, Jr., Harry W. Embry, Jr., S. Keyes, L. Leach, S. Leadley, Z. Norris, M. D. Powers, D. Schekler, B. Tyler, F. Vicery, and Eldon J. Waldron, as Participants in The Peoria Union Stock Yards Company Retirement Plan, Plaintiffs,**

v.

The **PENN MUTUAL LIFE INSURANCE COMPANY, a Pennsylvania Corporation, Defendant.**

No. 80–1235.

United States District Court, C. D. Illinois.

Aug. 4, 1981.

---

Dean B. Rhoads, Peoria, Ill., for plaintiffs.

David A. Nicoll, Peoria, Ill., for defendant.

### DECISION AND ORDER ON MOTION TO DISMISS

ROBERT D. MORGAN, Chief Judge.

The defendant, hereinafter Penn, has moved to dismiss all eight counts of the Complaint herein as to all of the plaintiffs, or to dismiss certain counts as to some of the plaintiffs named therein, or to compel a more definite statement as to alleged causes of action against it.

The plaintiffs are The Peoria Union Stock Yards Company, hereinafter Company, The Peoria Union Stock Yards Company Retirement Plan, hereinafter the Plan, the Trustees of the Plan, and some eleven named individuals who are alleged to be participants in the Plan. Fewer than all of those named plaintiffs are joined as plaintiffs in certain counts.

Before turning to a specific summarization of the complaint, certain observations are warranted. The genesis of the facts giving rise to the complaint is April 1, 1971. Effective as of that date, Company established a retirement plan for all of its employees. Effective as of the same date, Penn executed Group Deposit Contract No. DRH–152, hereinafter the contract, with the trustees of the Plan as contracting parties. The contract expressly provides that Penn is not a party to the Plan. The salient feature of the contract was that monies provided by Company for funding of the Plan would be deposited by the trustees with Penn to provide an aggregate fund from which Penn would purchase individual annuity contracts for Company employees as each retired and became eligible for retirement benefits.

A key paragraph of complaint which is incorporated in all counts is generic paragraph 7, which alleges, in summary, that Company had deposited $621,089 with Penn through May 30, 1980, that Penn advised the trustees that the fund balance was $714,821.54 as of May 30, 1980, and that in about June 1980, Penn advised the Plan that "after termination charges," the amount available "under the contract" was $605,098.48. Significantly, the complaint does not allege that the contract was terminated or that the trustees desire to terminate it. It contains only the inferences inherent in the paragraph 7 statement.

The trustees and the Plan are named as plaintiffs in Count I, which demands an accounting by Penn with respect to the fund. The jurisdictional basis for that count is dependent upon the several counts purporting to rest upon federal statutes. All of the named plaintiffs are joined as plaintiffs under Counts II through IV, in-

clusive, which are grounded upon Section 502 of the Employer Retirement Income Security Act of 1974 (ERISA). 29 U.S.C. § 1132. Company, the trustees, and the Plan are named as plaintiffs in Count V, in which jurisdiction is alleged to attach under the Securities Act of 1933, 15 U.S.C. § 77v, and Count VI which is grounded on Section 27 of the Securities Act of 1934. 15 U.S.C. § 78aa. Count VII is filed in the name of all plaintiffs and is grounded upon the Illinois Securities Law of 1953. Ill.Rev.Stat. 1979, ch. 121½, §§ 137.1, *et seq.* Count VIII, again joining all plaintiffs, purports to state a cause of action for common law fraud.

▇▇▇ Penn's position is patently correct, that certain of the counts must be dismissed as to certain of the plaintiffs joined therein. Count I is a suit on the contract, to which only the trustees are parties. That count must be dismissed as to the Plan.[1] Company is not a proper party to each of Counts II through IV, inclusive. ERISA creates a cause of action in favor of a retirement plan, the trustees of such plan, and the participants thereof only. 29 U.S.C. § 1132. Those counts must be dismissed as to Company. As to Counts V through VII, inclusive, assuming for present purposes that the contract is a security under both federal and Illinois law, only the trustees are parties to the contract and purchasers of a security within the intendment of the applicable statutes. Thus, Count V must be dismissed as to Company and the Plan; Count VI must be dismissed as to the Plan; and Count VII must be dismissed as to Company, the Plan, and the participants in the Plan.

Penn's memorandum in support of its motion suggests that the complaint is a shotgun blast, designed with the hope that some pellet of discovery might supply the factual basis for some cause of action. Reviewing the complaint as a whole, the characterization appears to have some considerable va-

lidity. Although it cannot be said with certainty that a sustainable statement of a cause of action cannot be made were an order entered to compel a more definite statement, it appears that economy of time for both the court and the parties can be advanced by an order allowing the motion to dismiss all counts, without prejudice, however, to a right of the plaintiffs, within some reasonable time, to file an amended complaint, if they can meet the requirements herein expressed. The complaint as now drawn is deemed to be so fraught with conclusory allegations that revision would be anticipated to lead only to subsequent motions to dismiss and further unnecessary proceedings.

An analysis of the complaint, as revised by the noted deletion of parties, proceeds in the context of the above comments. The basic factual background is the institution of the Plan by Company in 1971, and the trustees' negotiation of the contract, effective contemporaneously with the inauguration of the Plan.[2] The contract is attached as an exhibit to the complaint. The Plan is not before the court, and the same can have no bearing upon this controversy since Penn is not a party to the Plan.

The contract forms a central feature of any cause of action. It required the trustees to pay to Penn in each contract year, for credit to the Plan deposit account, the amount estimated by Penn to be sufficient to fund the benefits provided by the Plan, or an amount determined by Penn to be necessary to meet the qualification requirements of the Internal Revenue Code. It provided that Penn would credit interest to the deposit account, upon contributions to the account during the first three contract years, at a scale of stated rates set forth in section 3.1 of the contract. On contributions beginning with the fourth contract year, interest was to be "at such rates as shall be determined by" Penn.[3] Funds

---

1. It may be questionable that the Plan, as such, has entity status in any context other than ERISA, which does provide that a plan has standing to sue.

2. DRH–152 was executed July 30, 1971, effective as of April 1, 1971.

3. Section 3.1 provides:
   "3.1 *INTEREST*

withdrawn from the account were to be charged against deposits in the chronological order of their receipt by Penn. Annuity benefits were made, dependent upon the trustees supplying to Penn sufficient information as to a retiring participant, to enable Penn to determine the amount of annuity payments due. Such benefits were provided by the transfer to Penn from the deposit account, or additional contributions, if necessary, of the sum necessary to purchase an annuity for the retiring participant. The contract provided that Penn might deduct from the deposit account a specified expense charge in each contract year in which the total deposits to the account were less than $75,000, and a termination charge pursuant to a stated scale.[4] The pertinent termination clause provided that the contract would terminate, *inter alia,* upon receipt by Penn of written notice of termination from the trustees. Within 60 days after termination, the trustees were authorized to request that the deposit account be applied to the purchase of paid-up annuities. Absent such request, Penn agreed to pay "the net value of" the account to the trustees, or to their order, provided that payment of an account exceeding $100,000 would be made in equal annual installments over a period of five years, each installment to be not less than the smaller of $100,000, or the balance of the account. Interest was to accrue at the rate of not less than 3% per annum upon the balance, from time to time, of the account until full payment was made. Penn did have the authority to modify the contract terms after the expiration of the third contract year, in the areas of rates and factors set forth for annuity purchases, expense charges, termination charges, and maintenance charges after termination.[5]

"Penn Mutual, subject to the conditions stated below, shall credit interest to the Deposit Account as follows:

"(1) On contributions credited to the Deposit Account during the first three Contract Years, interest at the rate of:

"(i) 7-½% for the first three Contract Years,
"(ii) 7% for the next two Contract Years,
"(iii) 6-½% for the next five Contract Years,
"(iv) 4% for the next five Contract Years,
"(v) 3-½% thereafter.

"(2) On contributions credited to the Deposit Account in the fourth and subsequent Contract Years: interest at such rates as shall be determined by Penn Mutual.

"(3) Interest shall be credited as of the end of the Contract Year and shall be considered a contribution to the Deposit Account as of that date."

4. Section 6.1 provided:

"Penn Mutual may deduct the following charges from Contractholder's Deposit Account:

"(1) Expense Charge—An expense charge in each Contract Year during which the contract is not suspended and in which the total deposits for that year are less than $75,000. If the total annual deposit is less than $10,000, the maximum expense charge shall be $1,000 less 10% of that part of the deposit which exceeds $5,000. If the total annual deposit is $10,000 or over this charge shall be $500 less 1% of any amount by which the total deposit in the year exceeds $25,000. The expense charge shall be estimated by Penn Mutual based on the estimate of deposits for that Contract Year and shall be due on the first day of the Contract Year. Such charge shall be adjusted at the end of each Contract Year to conform to the total deposits made during such year. If the amount charged at the beginning of the Contract Year was less than the correct amount, the difference shall be deducted from the Deposit Account. If it was more than the correct amount, the difference shall be credited to the Deposit Account.

"(2) Surrender Charge—At such time as this contract shall be terminated in accordance with Section 7.4, except where the net value of the Contractholder's Deposit Account is applied to purchase paid-up annuities as provided in Section 7.5(1), a surrender charge which shall not exceed;

"(i) 25% of the first $20,000 of value of the Deposit Account, plus
"(ii) 10% of the next $30,000 of value of the Deposit Account, plus
"(iii) 3% of the next $450,000 of value of the Deposit Account, plus
"(iv) 1% of the value of the Deposit Account over $500,000.

"(3) Maintenance Fee—A reasonable fee for the cost of maintaining the account more than 60 days after the contract is suspended and not reinstated and any maintenance fee chargeable after termination of the contract under Section 7.5(3)."

5. Section 8.11 provided:

"Penn Mutual, at the beginning of the fourth and any subsequent Contract Year, and upon 90 days written notice to Contractholder may modify:

"(1) Any or all of the rates and factors set forth in Section 9, provided that rates no higher

Thus, it patently appears that the contract constituted Penn as the depository of funds required by the Plan, with such funds to be accumulated for the purpose of purchasing individual annuity contracts as the same were warranted by the Plan. The interest to accrue to the fund was specifically fixed, except that, as to deposits for the fourth and subsequent contract years, interest would be credited at such rates as Penn might fix. Penn undertook to do nothing except to accumulate the fund, to credit interest to the fund from time to time, and to expend such portions of the fund as were required from time to time to satisfy the annuity obligations which were created by the Plan.

■ Counts II through IV of the complaint depend entirely upon conclusory allegations that Penn is a fiduciary within the meaning and intendment of ERISA. The Complaint contains no reference to any provision of the contract which can be arguably construed to create a fiduciary relationship.

ERISA says:

"A person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21).

Decided cases which are cited have no direct application to this suit. Several district courts have held that an insurer which issues an insurance policy as a part of an employee benefit plan which is subject to the provisions of ERISA, does not, solely by virtue of its having issued a policy, become a fiduciary within the meaning of ERISA. *Austin v. General American Life Insurance Company*, 498 F.Supp. 844 (N.D.Ala.1980); *Lederman v. Pacific Mutual Life Insurance Company*, 494 F.Supp. 1020 (C.D.Cal.1980); *Cate v. Blue Cross and Blue Shield of Alabama*, 434 F.Supp. 1187 (E.D.Tenn.1977). The rationale of such decisions is the view that such a policy is merely an asset of the benefit plan which cannot constitute the insurer as a party to the plan itself.

Though neither controlling nor precisely apposite, those cases seem to support an analogy which militates against Counts II through IV in this complaint. From the face of the contract, the substantive document, it appears that the trustees voluntarily entered into the contract with Penn as an asset of the Plan. Examination of the contract discloses no language which would bring Penn within the statutory definition of a fiduciary. Moreover, each of these counts alleges that Penn was a fiduciary "at all times relevant" to the complaint. That allegation is sufficiently broad in scope to allege ERISA violations which may have occurred as early as April 1, 1971, a date which is almost four years prior to the effective date of the Act. ERISA was enacted in 1974, effective as of January 1, 1975. 29 U.S.C. § 1031(b).

Penn should be able to determine from the face of the counts themselves, at the very least, the predicative basis for the conclusion that it is a fiduciary under ERISA, the specific acts and omissions which are alleged to show a breach of a fiduciary duty, and the approximate date, or dates, when such acts were done or when such omissions occurred. Also, the court should be in a position to weigh the sufficiency of the complaint by the allegations which the

and factors no lower than those stated in the applicable schedule of Section 9 shall be used in applying to the purchase of annuities contributions credited to the Deposit Account during the period stated in such schedule.

"(2) The expense charge set forth in Section 6.1(1).

"(3) The terms and conditions of payment upon termination of the contract as provided in Sections 6.1(2) and 7.5 applicable to contributions credited to the Deposit Account in the fourth and subsequent Contract Years."

pleader chose to make. If there does exist a basis for an ERISA claim, this complaint does not state it.

Paragraph 15 of the Complaint, which is set forth fully below, contains the meat upon which each Counts II through VIII rest.[6] That paragraph is, in part, a misinterpretation of the contract language, and, in larger part, mere conclusory statements which are not fixed as to time or place. First, the allegation is made that Penn represented that funds would be credited with interest at the rates fixed by the contract or "the rate actually earned by" Penn. The interest provisions which are quoted above in a footnote tend to refute the quoted part of that allegation. The allegations of subparagraphs b, c, d, e and g are not only conclusory, but they also suggest that the conclusions stated relate to representations made, or to known facts not disclosed, when the contract was made in 1971. Subparagraph f, related to Penn's "internal accounting" procedures and its failure to disclose to the plaintiffs the position of the account as reflected by such accounting, contains no allegations as to what such procedures were, what facts the same would have revealed, and no time reference.

■ Counts V and VI of the complaint, grounded, respectively, on the 1933 Act and the 1934 Act, contain no factual basis for the conclusory statements that the contract was a security within the meaning of 15 U.S.C. §§ 77b(1) and 78c(10). Penn aptly suggests that the only part of the definition of a "security" contained in the Acts which could even arguably apply to this contract, is the "investment contract" provision. In *Securities and Exchange Commission v. W. J. Howey Co.*, 328 U.S. 293, 299, 301, 66 S.Ct. 1100, 1103, 1104, 90 L.Ed. 1244 (1946), the court said that an investment contract within the intendment of the Securities Acts is a transaction whereby a person is induced to invest in a common enterprise and is led to expect the realization of profits solely from the efforts of the promoters of the enterprise or some third party. By contrast, this contract contemplated the periodic deposit of moneys with Penn for accumulation, with the expectation of the trustees that retiring employees would receive, through that aggregation of funds, the benefits to which they were entitled under the Plan. There appears to be no profit motive in any real sense, but only the expectation that interest credited to the account would be incremental to the total fund.

Moreover, the Supreme Court has held in *International Brotherhood of Teamsters, etc. v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), that a noncontributory compulsory pension plan does not constitute a security within the intendment of the Securities Acts. The court further said that the enactment of ERISA demonstrates congressional intention that such pension plans are not subject to the Securities Acts. At 569–570, 99 S.Ct. at 801–802.

■ Those counts are also deficient in two other respects. As above observed, the allegations of paragraph 15, related to mis-

---

6. Paragraph 15 provides:

"Notwithstanding its duties and in violation thereof, Penn Mutual in connection with the *sale of the Contract and in performance under* the Contract:

"(a) represented that funds deposited under the Contract would be credited with interest at the greater of:

"(i) the rate guaranteed under the Contract; or

"(ii) the rate actually earned by Penn Mutual, when in fact Penn Mutual knew that it would not credit the funds deposited under the Contract with interest actually earned by Penn Mutual;

"(b) represented that charges under the Contract would be limited to the amounts specified in Section 6.1 thereof, when in fact Penn Mutu-

al knew that it would proceed to impose charges far in excess of those so specified;

"(c) failed to disclose the Retirement Plan's actual expenses under the Contract;

"(d) failed to disclose that annuity purchase rates under the Contract were loaded for expense purposes;

"(e) failed to disclose that Penn Mutual would impose substantial termination charges upon termination of the Contract;

"(f) maintained internal accounting reflecting the actual position of the Contract, and failed to disclose such actual position to the Retirement Plan and the Trustees;

"(g) failed to disclose to (sic) the commissions payable on account of entry into the Contract; "

representations and omissions, are conclusory, and not factually based. The failure to fix any time at which such representations were made, or at which such omissions occurred, must, of necessity, raise issues as to statutes of limitations. Whether the limitation provisions of the federal Acts or the Illinois Statute of Limitations would ultimately be applicable, a cause of action would be barred as to acts occurring more than three years prior to the filing of the complaint. 15 U.S.C. §§ 77m, 77*l*(2); Ill. Rev.Stat.1979, ch. 121½, 137.13 D. The more critical deficiency arises under the provisions of Rule 9(b) of the Federal Rules of Civil Procedure. The crux of the complaint, based upon an alleged violation of the Securities Acts, is fraudulent representation or the omission to make disclosures which must have been made to avoid an inference of fraudulent conduct in the sale of a security. Rule 9(b) requires that a complaint grounded on a fraud theory must allege the circumstances constituting the alleged fraud with particularity. "Simply denominating unspecified" statements or omissions "as false, misleading or inaccurate is not sufficient to satisfy Rule 9(b)." There must be specific identification of acts and omissions and a factual statement adequate to reflect the manner in which the same were false, misleading, or inaccurate. *Rich v. Touche Ross & Co.*, 68 F.R.D. 243, 247 (S.D.N.Y.1975). There must be a specific identification of actions contended to have been fraudulent, and factual statements as to times, places, and tenor of each alleged false representation or omission, and of the manner in which each is deemed to have been fraudulent. *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080 (S.D.N.Y.1977). The conclusory allegations of these counts fall far short of compliance with the requirements of the Rule.

Since it is deemed necessary to dismiss Counts II through VI, inclusive, the court has no jurisdiction of the dependent Counts I, VII and VIII, each of which is grounded upon state law. However, the comment is made, for whatever it may be worth, that Count VII, which is grounded on the Illinois Securities Law, appears to be subject to the same infirmities which are noted above

with respect to Counts V and VI, and that Count VIII appears to be woefully deficient in allegations which are necessary to state a cause of action for common law fraud. It is further observed that the critical paragraph 9 of Count I states the same apparent misinterpretation of the interest provisions of the contract which were noted above with reference to the allegations of paragraph 15.

Nothing here is intended to be dispositive of any substantive rights vis-a-vis the several parties. The court's function with respect to this motion is exhausted, with the determination that the complaint as drawn is insufficient to state any federal cause of action. Candor requires the statement that the court has serious difficulty in discerning any basis within the corners of the contract for an ERISA claim or a Securities Act claim, but the court is not prepared to preclude the plaintiffs from filing any amended complaint which is consistent with the views herein expressed.

Accordingly, IT IS ORDERED that the motion is ALLOWED and the complaint is DISMISSED.

IT IS FURTHER ORDERED that an amended complaint may be filed within twenty (20) days.