**Adam WARD, et al., Plaintiffs,**

v.

**Marvin KELLER, et al., Defendants.**

**No. C2–87–1448.**

United States District Court,
S.D. Ohio, E.D.

Sept. 5, 1991.

**440**

Gary M. Smith, Zanesville, Ohio, for plaintiffs.

Jack Alton, Lane, Alton & Horst, Columbus, Ohio, for Thomas Delay.

Bradley Snyder, Roetzel & Andress, and Thomas Michael, Columbus, Ohio, for Oshsenbein, Cole, Davis, Bierly, Kendricks, Roderick.

Karen L. Lazorishak, Ohio Atty. Gen. Office, for Schwertfager, Barry and Hyde.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

### I.

This case is before the Court pursuant to cross-motions for summary judgment filed by plaintiffs, Adam Ward, et al. ("plaintiffs" or "the Wards") and the state defendants, the current director of the Ohio Department of Human Services and the Deputy Director for family, children, and adult services within the Ohio Department of Human Services ("ODHS"). At the time the state defendants' cross-motion for summary judgment was filed, those positions were occupied by Pamela Hyde and David Schwertfager, respectively, although others persons may now occupy those positions. The issue presented is whether federal law requires ODHS to provide an administrative "fair hearing" to persons who are affected by actions taken by a county children's services agency even when such actions relate solely to non-monetary service issues, as opposed to financial matters such as foster care maintenance payments or adoption assistance payments. For the reasons which follow, the Court concludes that state administrative hearings on the issues raised in this case are not mandated by the 1980 amendments to the Social Security Act or regulations adopted thereunder.

### II.

The facts relevant to this motion are set forth in plaintiffs' first amended complaint, which was filed on June 10, 1988, and a subsequent stipulation of facts filed on October 15, 1990. Although the complaint contains allegations common to all the defendants in this case, including not only the state defendants but various county officials, the stipulation was designed to address solely the fair hearing issue. The facts material to the resolution of the issue presented by the cross-motions for summary judgment are not disputed.

According to the amended complaint, plaintiffs Adam and Tamara Ward are the parents of a daughter, Erica. Erica was born with an esophageal problem which subsequently required surgery and which, prior to that surgery, made it hard for her to eat. She did not gain much weight during her first months of life and, at some point, the Jackson County Children's Service Agency was advised that she was a possible victim of "failure to thrive" syndrome. After her surgery, she was required to be fed for approximately five months through an abdominal tube, which contributed to her difficulties.

According to the Wards' complaint, although their family was eligible for various supportive and protective services to assist them in dealing with Erica's problems, the services were not provided by Jackson County. Rather, the Wards alleged that Jackson County inappropriately provided only home monitoring, contributing to the stress of Erica's home life, and ultimately intervened by removing Erica from her parents on October 30, 1987 without justification. The Wards alleged that Jackson County Children's Services failed to explore less drastic forms of intervention and failed to provide other supportive and protective services which might have eliminated the need for Erica's removal, all in violation of federal guidelines which govern the provi-

sion of services to children who may be candidates for removal from the parental home.

The complaint contains a number of claims against Jackson County Children's Services, the Jackson County Commissioners, and the Jackson County Juvenile Judge. In addition, the complaint alleges that ODHS did not carry out its statutory duty to supervise the activity of Jackson County Children's Services. Finally, the complaint alleges the issue presented by this summary judgment motion, asserting that ODHS had adopted a policy which prevented the Wards from being able to raise these issues in an administrative hearing to be held by ODHS. The Wards allege that ODHS, in order to comply with federal law, was required to provide a fair hearing mechanism for persons like themselves who claim to be aggrieved by the failure of a county children's service agency to provide non-tangible benefits such as supportive and protective services.

Although the first amended complaint named only one state official as a defendant, that being Daisy Alford, identified as the Chief of the Division of Family and Children Services, ODHS's director was added as a defendant through a stipulation filed on June 24, 1988. That stipulation also changed the title of defendant Daisy Alford to Deputy Director for Family, Children and Adult Services within the Ohio Department of Human Services. Thus, the state defendants involved in the instant summary judgment proceedings are the successors to the Director and Deputy Director who were made parties to this action through the first amended complaint and subsequent stipulation.

The stipulation filed on October 15, 1990 is intended to explain the hearing policy adopted by ODHS. The parties agree that ODHS is responsible for administering those programs which receive federal funding through Titles IV–B and IV–E of the Social Security Act, 42 U.S.C. §§ 620–628 and 42 U.S.C. §§ 670–676. Those two titles cover a myriad of services and benefits made available in the area of children's services. ODHS provides notice to aggrieved individuals, and the right to a "fair hearing," with respect to matters covered by Title IV–E only when applications for and receipt of foster care maintenance payments or applications for and receipt of adoption assisted payments are at issue. ODHS provides such hearings with respect to services provided under Title IV–B only when some service is funded jointly by Title XX of the Social Security Act and Title IV–B. As more fully set forth on page 3 of the parties' stipulation, such hearings are provided only when an agency acts to reduce, suspend, terminate or withhold social services, refuses to provide such services in the first instance, or provides social services in a manner that the affected individual believes to be incorrect or under circumstances where the individual does not believe that social services should be provided. Moreover, ODHS does not provide any fair hearings in these areas if either the local children's services agency or the affected individuals are parties to a state juvenile court hearing. Thus, the parties agree that, with respect to many of the alleged violations of federal law which the Wards claim were committed by Jackson County Children's Services, no hearing would have been available from ODHS had one been requested.

Although it is difficult to tell from the pleadings whether the Wards ever requested such a hearing, it is apparent from the exhibits attached to the parties' stipulation that, in similar circumstances, other persons have been refused such a hearing by ODHS. Since this action was filed as a class action, and because the defendants apparently do not consider as significant the question of whether the Wards did or did not request such a hearing, the issue of the lawfulness of ODHS's hearing policy is properly at issue in this case and is adequately presented by the summary judgment motion.

Before turning to the merits of the motion, one additional matter should be clarified. The parties agreed that this issue was to be presented to the court through the Wards' summary judgment motion. Subsequently, the state defendants sought and were granted permission to cross-move

for summary judgment, although, of course, Fed.R.Civ.P. 56 would have allowed the Court to enter judgment in favor of the state defendants even if they had not formally moved for it. Once they moved for summary judgment, the state defendants asserted the right to file a reply brief in support of that motion after plaintiffs had submitted their reply brief in support of their motion. The Magistrate Judge denied the state defendants leave to file a further brief, and they moved for reconsideration of that decision.

Although the Magistrate Judge's decision was technically correct, the Court has reviewed the brief tendered by the state defendants in connection with their motion for reconsideration, and sees no prejudice which would result to the plaintiffs from the court's consideration of the arguments set forth therein. Consequently, this opinion and order is issued only after consideration of those additional arguments tendered by the state defendants.

### III.

Because this case involves issues of statutory and regulatory interpretation, it is helpful to set forth the key provisions of the statutes and regulations involved.

Title IV–B of the Social Security Act is found at 42 U.S.C. §§ 620–628. It is entitled "Child–Welfare Services" and provides, in § 620, for appropriations which permit the United States "to cooperate with State public welfare agencies in establishing, extending and strengthening child welfare services...." Section 621 contains allotment formulas stating how the annual federal appropriation is to be divided among the 50 states, the District of Columbia, Puerto Rico, the Virgin Islands and Guam. Section 622(a) states that in order for a state to be eligible for its share of the federal appropriation, the state must develop a plan for child welfare services which complies with the requirement set forth in § 622(b)(1) through (8). Those provisions, in turn, require generally such things as coordination among state programs dealing with child welfare, and describe the services to be provided and areas in which the state will make further progress with respect to those services. Section 622 does not contain a specific provision requiring that a hearing be held if any individual who is entitled to receive child welfare services described in the state's plan believes that the state, or a local agency, has not complied with the plan.

Title IV–E of the Act begins at 42 U.S.C. § 670. It provides for federal appropriations to permit states to provide "in appropriate cases, foster care and transitional independent living programs for children ... and adoption assistance for children with special needs...." Again, receipt of such funds is conditioned upon the state's adoption of a plan for foster care and adoption assistance. Section 671(a) sets forth the specific matters which such a plan must address. Unlike § 622, § 671(a)(12) requires that the state plan provide "an opportunity for a fair hearing before the State agency to any individual whose claim for benefits available pursuant to this part is denied or is not acted upon with reasonable promptness." Section 671(a)(15) also requires any state plan to provide that, in every case, reasonable efforts be made to prevent or eliminate the need for removal of a child from his or her home prior to any foster care placement, and that such efforts be made to permit the child to return home.

The Secretary has promulgated regulations under Parts IV–B and IV–E which also require state plans to contain certain provisions. These regulations begin at 45 C.F.R. Part 1355. 45 C.F.R. § 1355.21(b) states that "the State plans for Titles IV–E and IV–B must provide for compliance with the Department's regulations listed in 45 C.F.R. § 1355.30." Those regulations, in turn, state that the procedures and requirements in other sections of Title 45 of C.F.R. "shall apply to all programs funded under the provisions of these regulations and Titles IV–E and IV–B of the Social Security Act." Included among other applicable regulations are § 1355.30(k), which reads in full: "Section 205.10, Hearings." 45 C.F.R. § 205.10 requires a state agency responsible for any particular social securi-

ty program to provide either for a hearing before that agency, or an evidentiary hearing at the local level with the right of appeal to a state agency hearing. Section 205.10(a)(5) states as follows:

"An opportunity for a hearing shall be granted to any applicant who requests a hearing because his or her claim for financial assistance (including a request for supplemental payments under §§ 233.23 and 233.27) is denied, or is not acted upon with a reasonable promptness, and to any recipient who is aggrieved by any agency action resulting in suspension, reduction, discontinuance, or termination of assistance, or a determination that a protective, vendor, or two-party party payment should be made or continued."

Section 205.10, which covers all or a portion of six separate pages in the 1990 edition of Title 45 of C.F.R., also contains other extensive requirements concerning the nature of state hearings and the rights of participants in those hearings to continuation of benefits pending a decision.

There is also an agency interpretation which has some relevance to this matter. In 1983, ODHS asked the United States Department of Health and Human Services to clarify and explain the fair hearing process required under Public Law 96–272 (i.e., Titles IV–B and IV–E). In response, the U.S. Department of Health and Human Services issued a policy interpretation on October 26, 1983, and which was given a log number of ACYF–PIQ–83–4. The policy interpretation understood Ohio to be asking whether hearings are necessary for purposes other than determining fiscal eligibility and money grant amounts, which were already covered by a hearing process in place in Ohio.

In response, HHS stated that "fair hearings in relation to services as well as financial claims are therefore covered under this regulation [45 C.F.R. § 1355.30(k) and 45 C.F.R. § 205.10]." HHS acknowledged that § 205.10 provided no examples of service issues which could be the subject of a hearing process, and stated that the state had the option to provide an appropriate context for such hearings. However, under either situation (fiscal claims or service claims), HHS believed that a recipient must be advised of the right to a hearing, given timely notice of the date and place of the hearing, and be given the opportunity to be represented by an authorized representative. HHS also provided examples of service issues in Titles IV–E and IV–B that might result in a request for a hearing, such as an agency's failure to offer or provide appropriate pre-placement preventive services or reunification services, an agency's failure to provide services which were agreed to in the child's case plan, or an agency's refusal to act upon a request for a specific service. Policy interpretation ACYF–PIQ–83–4 is set forth on pages A–2 through A–4 of the Appendix to plaintiffs' motion for partial summary judgment.

There seems to be no dispute that, if HHS's interpretation of these regulations is correct, the state defendants were required to provide a hearing to the Wards or other similarly situated persons with respect to the matters at issue in this case. The question for the court, therefore, is whether HHS has correctly interpreted these regulations, or whether, as the state contends, neither the regulations nor the statute itself require a hearing under these circumstances.

### IV.

The arguments raised in this case require several levels of analysis. There are three sources of law to which the court must look in deciding whether a state hearing requirement has been created by federal law. The first is the governing statutes; the second is the implementing regulations; and the third is the agency's interpretation of those regulations. A somewhat different set of legal precepts applies to each level of analysis.

First, with respect to the interpretation of the statutes as enacted by Congress, "it is elementary that '[t]he starting point in every case involving construction of a statute is the language itself.'" *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361,

2366, 60 L.Ed.2d 980 (1979), *quoting Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring); *see also United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). If the statutory language is plain, it conclusively establishes the intent of the legislature except in those rare cases where the result of giving the statute its plain meaning is demonstrably different from the clear intent of the drafters of the statute. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. at 242, 109 S.Ct. at 1031; *see also United States v. Underhill*, 813 F.2d 105, 111 (6th Cir.), *cert. denied sub nom. Rayburn v. United States*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987).

Strict adherence to the rule that a statute is to be given its plain meaning has significant desirable consequences. First, it discourages judicial legislating, thereby keeping the legislative power vested in the appropriate and popularly-elected branch of government. It also encourages the drafters of legislation to speak plainly and precisely, knowing that if they do so, the courts will enforce the law as it has been clearly articulated. Finally, it promotes certainty in the law, eliminating the need for resort to other interpretive devices such as a review of legislative history, which is usually a grab-bag from which support for almost any interpretation of a statute can readily be plucked. There are cases, however, where Congress has not clearly expressed in the language of a statute what result was intended. "Where the literal language of the statute does not conclusively reveal legislative intent, the courts must look beyond literal meaning, analyzing the provision in context with the whole." *In re Arnett*, 731 F.2d 358, 361 (6th Cir.1984). Where the context of an entire statute does not reveal the meaning of a particular provision, resort to extrinsic aids to demonstrate Congressional intent, such as legislative history, can be an appropriate way to determine legislative intent, or at least to support a particular reading of a statute where the intent of the drafters is sufficiently obscure that it can never be divined with certainty.

The above rules of statutory construction apply in all cases, but the court must be mindful of some additional rules when interpreting a statute which has previously been construed, through the process of enacting regulations, by the agency charged with the duty to enforce the statute. It has been held that "[w]hen the issue is the validity of a regulation issued under a statute that agency is charged with administering, it is well established that the agency's construction of the statute is entitled to great weight." *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 928 (Fed. Cir.1984). Nevertheless, the Court must be mindful of its own duty to interpret the statute according to its plain meaning. "Although an agency's interpretation of the statute under which it operates is entitled to some deference, 'this deference is constrained by our obligation to honor the clear meaning of the statute, as revealed by its language, purpose, and history.'" *Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979), *quoting Teamsters v. Daniel*, 439 U.S. 551, 556 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979). Consequently, although in an appropriate case the party attacking an agency's interpretation of a statute through the issuance of a regulation bears a heavy burden of persuasion, the Court "will not abdicate to federal agencies the interpretation of regulations which are promulgated pursuant to an empowering statute.... Any regulation promulgated pursuant to rule making authority conferred by statute assumes the force of law only to the extent that it is consistent with the statutory scheme it was designed to implement." *Mitchell v. White Motor Credit Corp.*, 627 F.Supp. 1241, 1249 (M.D.Tenn.1986).

■ In this case, the Court must deal not only with the intent of Congress in passing the statute involved, and with the reasonableness of the Secretary's interpretation of that statute through the adoption of regulations, but also the issue of interpreting the meaning of those regulations in

light of the Secretary's own construction of them. It is also well-established that an administrative agency's interpretation of its own regulations is entitled to substantial deference. *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Bradley v. Austin,* 841 F.2d 1288 (6th Cir.1988). Again, however, the Court is constrained to reject an agency's interpretation of a regulation if the interpretation is clearly at odds with the language of the regulation itself—that is, an interpretation is acceptable only if it "does no violence to the plain meaning of the [regulatory] provision." *University of Cincinnati v. Bowen,* 875 F.2d 1207, 1209 (6th Cir. 1989), *quoting Deukmejian v. Nuclear Regulatory Commission,* 751 F.2d 1287, 1310–11 (D.C.Cir.1984); *see also Fluor Constructors v. Occupational Health and Safety Review Commission,* 861 F.2d 936, 939 (6th Cir.1988).

It is with these guiding principles in mind that the Court now turns to the precise legal issues presented in this case.

### V.

Plaintiffs' case rests upon the proposition that at each of the three levels of applicable federal law—interpretation, regulation, and statute—the requirement for a state hearing for non-monetary, or service, issues can fairly be implied. Conversely, if the Secretary's interpretation of the applicable regulations, the regulations themselves, or the governing statutes do not contain such a requirement, summary judgment in favor of defendants will be appropriate. The analysis begins at the stage of administrative interpretation of the applicable regulations.

### A.

■ The simplest question presented in this case is whether the Secretary has interpreted the applicable regulations to require fair hearings for service-related issues. The policy interpretation issued on October 26, 1983 is clear. On page 2, the author of the interpretation, Lucy C. Biggs, Acting Commissioner of the Administration for Children, Youth and Families, states that "[f]air hearings in relation to services as well as financial claims are therefore covered under this regulation [45 C.F.R. 1355.30(k) and 45 C.F.R. 205.10]." The interpretation also states that the hearing procedures which must be followed are those set forth in § 205.10, even though those procedures were originally created solely for financial issues. The interpretation did give Ohio the option of modifying the context of the hearing to accommodate service program complaints, but noted that recipients of services must be advised of the right to a hearing, which presumably will be held before the state agency. Consequently, the court must determine whether this interpretation is a permissible construction of the regulations.

### B.

■ The analysis of the regulations begins with 45 C.F.R. § 1355.30. The provisions of that regulation must be incorporated into any state plan written for purposes of securing funding under Titles IV–E and IV–B because of 45 C.F.R. § 1355.21(b), which states in full that "the State plans for Titles IV–E and IV–B must provide for compliance with the Department's regulations listed in 45 C.F.R. 1355.30." Section 1355.30, in turn, states that the procedures and requirements in other sections of Title 45 apply to all programs funded under Titles IV–B and IV–E, including the hearing requirement set forth in § 205.10. Section 1355.30(k) does not provide any further guidance as to whether such hearings are applicable for service-related issues, but a review of all of Parts 1355, 1356, and 1357 sheds additional light on that issue.

45 C.F.R. Part 1356 is specifically applicable to Title IV–E. Section 1356.60, which is entitled "Fiscal Requirements," provides as follows. First, it sets forth the requirements for the receipt of federal matching funds for foster care maintenance and adoption assistance payments. Second, it contains provisions for the receipt of federal matching funds for state and local training for foster care and adoption assistance programs. Third, it sets forth the condi-

tions for receipt of federal matching funds for other state and local administrative expenditures under Title IV–E. It allows federal participation at the rate of 50% for "administrative expenditures necessary for the proper and efficient administration of the Title IV–E State Plan." Included in "necessary and proper" administrative expenditures are:

> (1) The determination and redetermination of eligibility, *fair hearings and appeals*, rate setting and other costs directly related only to the administration of the foster care program under this part are deemed allowable administrative costs under this paragraph. (emphasis supplied).

Thus, it is certainly contemplated that fair hearings under some circumstances will be held under Title IV–E.

In contrast, Part 1357 of Title 45 C.F.R., and specifically § 1357.30, which is entitled "Fiscal Requirements (Title IV–B)," makes no mention of fair hearings. Section 1357.-30(e) makes federal financial participation available only for costs incurred in implementing §§ 422, 423, 425 and 427 of the Act (42 U.S.C. §§ 622, 623, 625 and 627), none of which contain any reference to a fair hearing requirement. In fact, the words "fair hearing" do not appear anywhere in 45 C.F.R. Part 1357. Thus, Parts 1355 through 1357, read together, suggest that the Secretary perceived the difference between financial matters funded under Title IV–E, and non-financial matters funded under either Title IV–E or IV–B, and intended the state to hold a fair hearing (and be eligible for reimbursement for doing so) only in the first category of cases.

This reading of the regulations is buttressed by § 1355.30(k)'s incorporation of the hearing provisions set forth in 45 C.F.R. § 205.10. That section, which was promulgated under Titles I, IV–A, X, XIV, and XVI of the Social Security Act, contains very detailed procedures for state hearings. The parties do not appear to dispute that when § 205.10 was adopted, it was intended to apply only to matters of financial assistance or eligibility. Each of these titles to which it applies by its terms

deals with the provision of financial assistance to individuals. Title I provides for grants to states for old-age assistance; Title IV–A deals with aid to families with dependent children; Title X deals with aid to the blind; Title XIV deals with aid to the totally and permanently disabled; and Title XVI deals with supplemental security income for aged, blind and disabled persons. Section 205.10(a)(5) affords an opportunity for a hearing only to applicants whose claims for financial assistance are denied or otherwise affected, and to any recipient who is aggrieved by agency action affecting that recipient's "assistance." Although the word "financial" is not repeated before the second appearance of the word "assistance" in that section, it is clear both from that section and the balance of § 205.10 that the assistance referred to is financial assistance. *See, e.g.,* § 205.10(a)(6)(i), which refers to "recovery" of assistance and § 205.10(a)(7), which speaks in terms of assistance not being "paid." Such concepts as payment and recovery are not ordinarily used to describe the provision or termination of non-financial benefits.

■ If this court were construing the regulatory scheme set forth in 45 C.F.R. § 205.10 and Parts 1355, 1356 and 1357, without the benefit of any interpretation from the Secretary, the Court would conclude that fair hearings for service-related issues are clearly not contemplated by those regulations. Since an interpretation has been rendered, however, the question is whether the court's obligation to give substantial weight to the Secretary's interpretation of these regulations is sufficient to overcome the principal that such an interpretation must be rejected if it is "clearly at odds" with the language of the regulations themselves. For the following reasons, the court concludes that the Secretary's interpretation is clearly at odds with the regulations.

As noted above, Parts 1356 and 1357, dealing with Title IV–E and IV–B, respectively, differ markedly in that fair hearings, and reimbursement for the costs of holding such hearings, are mentioned only in Part 1356. Further, even the Secre-

tary's own interpretation concedes that § 205.10 was never intended to apply to service-related issues. Viewed against that background, the conclusion that a general provision at § 1355.30(k) that state plans which are required to address both financial and non-financial issues, and to address issues under both Titles IV–E and IV–B, have a requirement for fair hearings on service related issues simply by virtue of the terse incorporation of hearing procedures set forth in 205.10 strikes the court as manifestly unreasonable. Although the Secretary is not required to set forth with precision every facet of the operation of programs under the Social Security Act, and has considerable leeway in drafting broad regulations or interpreting ambiguous ones to produce a certain program result, the regulations drafted under Titles IV–E and IV–B really leave little doubt that the Secretary did not intend to create a new hearing procedure, which concedely would require modification of the hearing requirement set forth in § 205.10, for all service-related issues that arise under either Title IV–E or IV–B.

Plaintiffs have argued, however, that the Secretary's interpretation of these new regulations cannot be judged simply by reference to the language of the regulations themselves, but must be viewed in the context of the history of the 1980 changes to the Social Security Act and the regulations which existed at that time. In particular, they assert that a review of former 45 C.F.R. § 1392.11, which became effective August 25, 1980 and which was replaced after enactment of Public Law 96–272, shows that hearings with respect to service-related issues were available under the law before it changed, and that the rearrangement of the law and the regulations cannot have been intended to eliminate hearing rights which existed previously. The Court concludes that this argument does not add reasonableness to the otherwise unreasonable interpretation of the regulations which the Secretary has made.

It is true that certain service-related issues were the subject of a fair hearing requirement under previous Titles IV–A and IV–B and under the previous regula-

tions. Section 1392.11(a) required a state plan to provide for a fair hearing "under which applicants and recipients may appeal denial of or exclusion from a service program, failure to take account of recipient choice of service or a determination that the individuals must participate in the service program." Certainly, that regulation contemplated that some non-monetary issues would be subject to the fair hearing requirement. However, it limited those issues to three specific situations, two of which involved the direct denial of a request from a recipient to participate in a particular program, and the third of which involved forcing an unwilling recipient to do so. Other service-related issues, including particularly a number of those involved in this case, were expressly *exempted* from the fair hearing process.

Former § 1392.11(b) stated that in addition to the *hearing* procedure mandated for the three limited categories of service-related issues described in § 1392.11(a), "[t]here must be a system through which recipients may present *grievances* about the operation of the service program" (emphasis supplied). As the court understands the plaintiff's argument in this case, grievances about the operation of service programs, and in particular about the operation of Jackson County Children's Services, which would have formerly been relegated to an informal grievance procedure, would now be subject to a full-blown fair hearing before the state agency. That would be so even though the regulations are now much less explicit about the circumstances under which hearings are required than they were previously. It is very difficult to conclude that the current regulations, silent as they are about such hearings, can reasonably be interpreted to *expand* rights available under previous law to the types of matters at issue in this case. Indeed, it is hard to read those regulations as perpetuating fair hearing rights for the three situations described in § 1392.11, because the Secretary was obviously aware how to make those rights explicit in previous regulations, and apparently chose not to do so in the current regulations. For all of these

reasons, the court concludes that the applicable regulations do not provide for fair hearings for service-related issues, and that any interpretation of the regulations to the contrary, even given the duty of the court to defer to the Secretary's interpretation, is manifestly at odds with the language of the regulations and cannot be upheld.

## C.

■ Having held that the regulations cannot reasonably be interpreted in plaintiffs' favor, it is perhaps unnecessary to decide, in the alternative, whether the regulations constitute a permissible exercise of statutory authority granted to the Secretary. However, since the parties have briefed that issue extensively and because it provides an alternative basis for the court's holding, the court will address that issue as well.

As required, the court begins with the plain language of the two statutes. Upon examination of that language, the difference between Titles IV–B and IV–E is striking. Both contain a section setting forth the requisite features of state plans, for child welfare services (Title IV–B) and for foster care and adoption assistance (Title IV–E). 42 U.S.C. § 622, part of Title IV–B, contains eight specific matters which a state plan must contain. None of those is a requirement for a fair hearing. 42 U.S.C. § 671 contains 17 specific provisions for a plan to qualify under that section. Section (a)(12) requires the plan to provide for a fair hearing before the state agency to any individual whose claim for benefits available under Title IV–E is denied or is not acted upon with reasonable promptness. It is difficult to construe the complete absence of any reference in Title IV–B to fair hearings as authority for the Secretary affirmatively to require the State's IV–B plan to contain a provision for them. Further, given the fact that both sections were enacted on the same day as part of the same legislation, the stark contrast between the two provides additional objective evidence of the legislative intent not to require fair hearings for issues arising under Title IV–B.

The Court has reviewed plaintiffs' argument that the deletion of a "watered down" hearing requirement from Title IV–B, which was in the Senate version of the bill, is affirmative evidence that Congress intended to leave matters as they existed then—namely, that fair hearings were required under Title IV–B because 45 C.F.R. § 1392.11, in force at that time, required them. As noted above, there were limited situations under which such hearings were required to be held under the previous version of Title IV–B, so that it is not completely accurate to characterize the Senate version of the bill as a retraction of rights which existed at that time. In any event, notwithstanding the plaintiffs' creativity, it is hard to interpret the deletion of a specific provision that would have required less extensive hearings for some service-related issues arising under Title IV–B to be evidence of an intent to require more extensive hearings for all service-related issues arising under Title IV–B. It is the Court's conclusion, based upon the plain language of 42 U.S.C. § 622, and the overall context of Public Law 96–272, that such hearings are not required, and no amount of juggling the legislative history is sufficient to overcome that conclusion.

There is a final issue to be determined, which is whether the fair hearing requirement specifically enacted in the law as part of Title IV–E should extend to service-related issues arising under that Title, notwithstanding the fact that no such requirement exists under Title IV–B. Again, it is the Court's conclusion that the plain language of the statute permits only one conclusion to be drawn, and that is that such hearings are not required.

The Court has already concluded that the Secretary's interpretation of the statute through the regulations does not require that hearings be held for service-related issues under Title IV–E. An independent review of the statute reveals the lack of authority for any regulation which would do so. Section 671(a)(12) requires a fair hearing before the state agency only for an individual "whose claim for benefits avail-

able pursuant to this part is denied or is not acted upon with reasonable promptness...." Plaintiffs argue that the word "benefits" is a broader term than such words as "assistance" or "payment," and that it encompasses service-related issues as well. Whether or not that is so, the phrase "claim for benefits" appears to this court to have a common meaning, and that is a monetary claim. It is difficult to characterize a parent's dissatisfaction with a children's service agency, and in particular with the agency's failure *sua sponte* to provide the parent with some available social service program, to constitute a "claim for benefits." As the Secretary apparently recognized when promulgating former 45 C.F.R. § 1392.11(a), such actions as denial of or exclusion from a service program, failure to take account of recipient choice of service, or a determination that the individuals must participate in a service program, can all be described in precise phrases. Similarly, that same section referred to "grievances about the operation of a service program," another phrase which much more precisely defines the type of matters at issue in this case. A phrase like "claim for benefits" is not the type of language which would ordinarily be selected to include matters susceptible of much more precise definition.

This is a case where, given the additional burden which would be placed upon the state through having fair hearings for all types of intangible service grievances, the court should require much more specific evidence of legislative intent than the use of a generic phrase which, to the more reasonable interpreter, speaks solely to monetary claims for financial benefits. Consequently, the court concludes that Ohio has correctly perceived its obligations under Title IV–E to be limited to providing fair hearings when monetary issues are at stake.

### VI.

The facts recited in the complaint in this case present a sympathetic picture of plaintiffs who were unjustly deprived of their child for a significant period of time under circumstances where, if the children's services agency had acted appropriately, such removal could have been avoided. There may well be persuasive reasons for providing such persons with the right to a hearing before the state administrative agency charged with oversight of the children's services program so that these matters can be both brought to the attention of that agency and addressed in a formal context. However desirable such a system is, it does not appear to this Court that it is a system which Congress has made mandatory in order for the states to share in funding for the provision of children's welfare services or foster care and adoption assistance. Consequently, the Court HOLDS that a "fair hearing" provision for non-monetary issues arising under either Titles IV–B and IV–E of the Social Security Act is not required to be included in the State Plan adopted under those Titles, and the state defendants' motion for summary judgment on this issue is therefore GRANTED. The plaintiffs' motion for summary judgment on this issue is DENIED.