**GUERNSEY MEMORIAL
HOSPITAL, Plaintiff,**

v.

**Louis W. SULLIVAN, M.D., Secretary
of Health and Human Services,
Defendant.**

No. C2–90–828.

United States District Court,
S.D. Ohio, E.D.

March 30, 1992.

Scott Winfield Taebel, Bricker & Eckler, Columbus, Ohio, for plaintiff.

Joseph E. Kane, U.S. Atty., Columbus, Ohio, for defendant.

## MEMORANDUM AND ORDER

HOLSCHUH, Chief Judge.

### I.

Guernsey Memorial Hospital, a nonprofit acute care hospital located in Cambridge, Ohio, filed this action seeking review of a final decision of the Healthcare Financing Administration (HCFA) administrator dealing with two cost reimbursement issues arising under Medicare. The parties agree that this court has jurisdiction to review that decision under 42 U.S.C. § 1395*oo*. The record of administrative proceedings has been filed with the court, and the parties have each moved for summary judgment, supplementing their respective filings as recently as March 12, 1992, with citations to additional decisions of the Provider Reimbursement Review Board, the HCFA administrator, two other district courts, and the United States Supreme Court. The court's review of the Secretary's decision is not *de novo*, but is limited to determining whether the Secretary's action was unsupported by substantial evidence, or was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 42 U.S.C. § 1395*oo* (f)(1); *Memorial Hospital/Adair County Health Center v. Bowen*, 829 F.2d 111, 116 (D.C.Cir.1987).

### II.

The facts in this case are not in dispute. In 1972, Guernsey Hospital issued $7,600,000 in bonds to finance capital improvements. In 1982, it issued another $10,410,000 of bonds for similar purposes. In 1985, in order to take advantage of more favorable interest rates which would, in its view, save it approximately $12,000,000 in debt service over the life of the two prior bond issues, eliminate certain restrictions on additional borrowing contained in those debt instruments, and free up funds to buy medical equipment, the hospital participated in a new bond issue in the amount of $15,375,000.

The refinancing arrangement involved, *inter alia*, deeding the hospital to the City of Cambridge and leasing it back. It also required the hospital to deposit $16,011,200 in an escrow account under the control of BancOhio National Bank as trustee. In exchange for doing so, the hospital was

released of any further obligation to the bondholders who purchased hospital bonds in 1972 and 1982. The trustee would use the money in escrow to "advance purchase" some or all of the old bonds, and was also entitled to use the rent payments made by the hospital to the city for purposes of repaying the new bonds. To that end, a Debt Service Fund, or DSF, was created, divided into two separate accounts, one for the repayment of principal on the bonds, and one for the repayment of interest.

Because this refinancing occurred in 1985, Guernsey Hospital was required, under applicable regulations, to report the impact of the refinancing pursuant to Generally Accepted Accounting Procedures (GAAPs). The parties agree that, under GAAPs, the hospital properly reported a loss of $672,581 in 1985. Guernsey Hospital sought to include this loss as an operating cost for 1985, and to receive appropriate reimbursement for the loss under the Medicare program.

In Ohio, requests for reimbursement under Medicare are channeled through a fiscal intermediary, which has primary responsibility for determining what costs will be reimbursed. In this case, the fiscal intermediary was Blue Cross and Blue Shield/Community Mutual Insurance Company. That entity determined that, under provisions set forth in the Provider Reimbursement Manual, the loss could not be taken in full in 1985, but rather was required to be amortized over a period of years. Guernsey Hospital appealed that decision to the Provider Reimbursement Review Board, which overruled the fiscal intermediary. The Board, in turn, was reversed by the HCFA administrator, who concluded, like the fiscal intermediary, that the loss would have to be amortized. That issue is the primary one presented for review.

Guernsey Hospital has also asked this court to review a second decision of the administrator which, again, upheld the action of the fiscal intermediary and overruled the Provider Reimbursement Review Board. A certain amount of interest was earned on the interest portion of the Debt Service Fund during 1985. The Secretary offset that interest against other interest expenses incurred by Guernsey Hospital. The hospital contends that the Debt Service Fund, including both the principal account and the interest account, is a "qualified funded depreciation account." If that is so, under applicable regulations, the interest earned in such an account may not be used by the Secretary to offset other interest expenses claimed by the hospital. As with the first issue presented for review, the facts concerning this matter are not in dispute. Rather, it is the Secretary's interpretation of applicable regulations which Guernsey Hospital seeks to have this court overturn.

III.

As with most cases involving actions by the Secretary of Health and Human Services, there are three sources of authority which must be examined. The first is the governing statute; the second consists of the implementing regulations; and the third is the Secretary's interpretation of those regulations. Because the two reimbursement issues in this case are governed by different sets of regulations, the Court will treat each separately. The court will also, prior to analyzing the Secretary's action in this case, enunciate the appropriate standard for review of the Secretary's interpretation of the regulations and statute at issue.

A. *The Bond Refinancing Issue*

1. *Applicable Statutes, Regulations and Interpretations.*

 The basic statutory authority for reimbursement of reasonable costs by qualified healthcare providers is 42 U.S.C. § 1395x(v). The statute provides, in pertinent part:

"(1)(A) The reasonable costs of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method

or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; ... In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment ... to providers of services on account of services furnished to such recipients by such providers."

Acting under this statutory grant of authority, the Secretary has promulgated regulations relating to reimbursement of Medicare providers. Those regulations now appear at 42 C.F.R. Part 413. The general principles for cost reimbursement are set forth in 42 C.F.R. § 413.5, which provides that "[a]ll necessary and proper expenses of an institution in the production of services ... are recognized." The parties agree that the refinancing cost incurred by Guernsey Hospital is a cost which is reimbursable under this general principle. As noted above, the disagreement involves the timing of reimbursement. The parties appear to agree that there is no specific regulation which addresses this issue.

The more general regulation dealing with the timing of payments is 42 C.F.R. § 413.20, which is contained in Subpart B of the regulations ("Accounting Records and Reports"). Section 413.20(a) requires that providers "maintain sufficient financial records and statistical data for proper determination of costs payable under the program." It then provides:

"Standardized definitions, accounting, statistics, and reporting practices that are widely accepted in the hospital and related fields are followed. Changes in these practices and systems will not be required in order to determine costs payable under the principles of reimbursement. Essentially the methods of determining costs payable under Medicare involve making use of data available from the institution's basis accounts, as usually maintained, to arrive at equitable and

proper payment for services to beneficiaries."

Further, 42 C.F.R. § 413.24 requires providers who receive payment on the basis of reimbursable costs to provide adequate cost data based upon verifiable financial and statistical records. That section requires that the accrual method of accounting be followed which, according to § 413.24(b)(2), means that "revenue is reported in the period when it is earned ... and expenses are reported in the period in which they are incurred...."

These regulations, of course, must be applied by fiscal intermediaries who administer the Medicare program. To assist them in doing so, the Secretary has also published the PRM, which does not have the force of regulation because it was not subject to the notice and comment procedure which precedes adoption of regulations codified in CFR. Section 233 of the PRM, published in May, 1983 and in effect when Guernsey Hospital refinanced its debt, deals specifically with advance refunding. Section 233.3 requires that debt issue costs on the "refunding debt" be amortized over the life of that debt, and that call premiums or penalties of serial bonds must be prorated over the scheduled maturity or recall dates of those bonds. As set forth at the conclusion of that section, "[t]he effect of the above treatment is to implicitly recognize any gain or loss incurred as the result of an advance refunding over the period from the date the refunding debt is issued to the date the holders of the refunded debt receive the principal payment, rather than immediately." (Administrative Record at 991–92).

One further matter is relevant to this issue. The parties also agree that current GAAPs, represented by Opinion No. 26 of the Accounting Principles Board and Statement No. 76 of the Financial Accounting Standards Board, would recognize the entire cost of the refunding debt as an expense in the year incurred. Thus, a very narrow issue is presented for review: is the Secretary required, by the applicable statute and regulations, to treat Guernsey Hospital's 1985 refinancing expense in ac-

cordance with generally accepted accounting principles, or may the Secretary, following the PRM, elect a different treatment? The court now turns to the appropriate legal analysis of this question.

### 2. *Legal Standard Applicable.*

The arguments raised in this case require several levels of analysis. There are three sources of law to which the court must look in deciding which party's interpretation of federal law is correct. The first is the governing statutes; the second is the implementing regulations; and the third is the agency's interpretation of those regulations. A somewhat different set of legal precepts applies to each level of analysis.

First, with respect to the interpretation of the statutes as enacted by Congress, "it is elementary that '[t]he starting point in every case involving construction of a statute is the language itself.' " *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979), *quoting Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring); *see also United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). If the statutory language is plain, it conclusively establishes the intent of the legislature except in those rare cases where the result of giving the statute its plain meaning is demonstrably different from the clear intent of the drafters of the statute. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. at 242, 109 S.Ct. at 1031; *see also United States v. Underhill*, 813 F.2d 105, 111 (6th Cir.), *cert. denied sub nom. Rayburn v. United States*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987).

Strict adherence to the rule that a statute is to be given its plain meaning has significant desirable consequences. First, it discourages judicial legislating, thereby keeping the legislative power vested in the appropriate and popularly-elected branch of government. It also encourages the drafters of legislation to speak plainly and precisely, knowing that if they do so, the courts will enforce the law as it has been clearly articulated. Finally, it promotes certainty in the law, eliminating the need for resort to other interpretive devices such as a review of legislative history, which is usually a grab-bag from which support for almost any interpretation of a statute can readily be plucked. There are cases, however, where Congress has not clearly expressed in the language of a statute what result was intended. "Where the literal language of the statute does not conclusively reveal legislative intent, the courts must look beyond literal meaning, analyzing the provision in context with the whole." *In re Arnett*, 731 F.2d 358, 361 (6th Cir.1984). Where the context of an entire statute does not reveal the meaning of a particular provision, resort to extrinsic aids to demonstrate Congressional intent, such as legislative history, can be an appropriate way to determine legislative intent, or at least to support a particular reading of a statute where the intent of the drafters is sufficiently obscure that it can never be divined with certainty.

The above rules of statutory construction apply in all cases, but the court must be mindful of some additional rules when interpreting a statute which has previously been construed, through the process of enacting regulations, by the agency charged with the duty to enforce the statute. It has been held that "[w]hen the issue is the validity of a regulation issued under a statute that agency is charged with administering, it is well established that the agency's construction of the statute is entitled to great weight." *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 928 (Fed. Cir.1984). Nevertheless, the Court must be mindful of its own duty to interpret the statute according to its plain meaning. "Although an agency's interpretation of the statute under which it operates is entitled to some deference, 'this deference is constrained by our obligation to honor the clear meaning of the statute, as revealed by its language, purpose, and history.' " *Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979), *quoting Team-*

sters v. Daniel, 439 U.S. 551, 556 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979). Consequently, although in an appropriate case the party attacking an agency's interpretation of a statute through the issuance of a regulation bears a heavy burden of persuasion, the Court "will not abdicate to federal agencies the interpretation of regulations which are promulgated pursuant to an empowering statute.... Any regulation promulgated pursuant to rule making authority conferred by statute assumes the force of law only to the extent that it is consistent with the statutory scheme it was designed to implement." Mitchell v. White Motor Credit Corp., 627 F.Supp. 1241, 1249 (M.D.Tenn.1986).

In this case, the Court must deal not only with the intent of Congress in passing the statute involved, and with the reasonableness of the Secretary's interpretation of that statute through the adoption of regulations, but also the issue of interpreting the meaning of those regulations in light of the Secretary's own construction of them. It is also well-established that an administrative agency's interpretation of its own regulations is entitled to substantial deference. Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Bradley v. Austin, 841 F.2d 1288 (6th Cir. 1988). Again, however, the Court is constrained to reject an agency's interpretation of a regulation if the interpretation is clearly at odds with the language of the regulation itself—that is, an interpretation is acceptable only if it "does no violence to the plain meaning of the [regulatory] provision." University of Cincinnati v. Bowen, 875 F.2d 1207, 1209 (6th Cir.1989), quoting Deukmejian v. Nuclear Regulatory Commission, 751 F.2d 1287, 1310–11 (D.C.Cir.1984); see also Fluor Constructors v. Occupational Safety and Health Review Commission, 861 F.2d 936, 939 (6th Cir.1988).

It is with these guiding principles in mind that the Court now turns to the precise legal issues presented by the 1985 refinancing.

3. Analysis.

It is helpful to set forth, briefly, the details of each party's position and the support which each has marshalled. The court begins with the Hospital's position, which is, in essence, the position taken by the PRRB in several different matters presenting essentially the same facts, and which has been adopted by judicial decisions from the Western District of Kentucky and the District of Maine. Relying primarily upon the rationale of decisions such as Charlotte Memorial Hospital and Medical Center v. Bowen, 860 F.2d 595 (4th Cir.1988), the Hospital claims that the Medicare Act requires both that reasonable costs of Medicare providers be reimbursed, and that the Secretary promulgate regulations after considering accounting practices which are generally followed in the industry. Building upon that statutory mandate, the Secretary's regulations (primarily 42 C.F.R. §§ 413.20 and 413.24) provide that, unless there is some other regulation to the contrary, the Secretary shall reimburse costs based upon the accrual method of accounting and in accordance with generally accepted accounting principles. There is no promulgated regulation which provides for a different treatment of costs incurred in refinancing. Consequently, any effort by the Secretary, through the PRM or otherwise, to treat the refinancing costs other than in accordance with GAAPs is "contrary to the law" in the sense that it contradicts the regulations which have been promulgated. The keystone to this argument is, of course, the claim that "where the specific regulation is silent on the subject [of the particular costs involved], as it is here, the regulation establishing general principles for cost reporting must be deemed applicable," and that the regulation requires the Secretary to follow GAAPs. National Medical Enterprises v. Bowen, 851 F.2d 291, 294 (9th Cir.1988).

The Secretary agrees that the Medicare Act requires both reimbursement of reasonable costs and consideration of GAAPs. The Secretary further agrees that the accrual method of accounting should ordinarily be followed, and that hospitals are required to report their costs in accordance

with GAAPs. However, the Secretary views 42 C.F.R. § 413.20 as a reporting requirement, and not as a mandate that costs be reimbursed in the same fashion as they are required to be reported. Rather, the Secretary's position is that if any other permissible purpose served by Medicare reimbursement, such as prevention of cross-subsidization or recharacterization of accounting charges to make them more reflective of the economic reality of delivery of services to patients, is served, the Secretary can choose to depart from GAAPs so long as that departure is not arbitrary. The Secretary's position is perhaps best stated by the following quotation from *American Medical International, Inc. v. Secretary of HEW,* 466 F.Supp. 605, 623 (D.D.C.1979); "this provision [42 C.F.R. § 413.20] only provides that accepted accounting practices be used in uniform record-keeping, not in determining costs allowable under the Medicare Act," *aff'd,* 677 F.2d 118 (D.C.Cir.1981). Because the regulation does not, in the Secretary's view, mandate slavish adherence to GAAPs, and because the Secretary has a reasonable basis for concluding that the "loss" experienced by Guernsey Hospital in 1985 relates to future benefits—i.e., the reduction in interest payments over the course of many years—the Secretary did not act arbitrarily in determining, in accordance with the PRM, that the cost must be amortized. The Secretary stresses that amortizing this cost does not violate principles of accrual accounting, and the issue here is not whether the accrual method is being followed, but whether the Secretary is free to follow the minority view of the FASB and require that the 1985 loss be amortized.

The two district courts which have considered this precise issue have both adopted Guernsey Hospital's position. The more detailed of the two decisions is Magistrate Judge Cohen's opinion in *Mercy Hospital v. Sullivan,* No. 90–0024 P, 1991 WL 104090 (D.Me. April 25, 1991) *aff'd Mercy Hospital v. Sullivan,* No. 90–0024 P (September 13, 1991) (Carter, Chief Judge). *Mercy Hospital* dealt with a slightly different situation, in that the PRM sections in effect at that time allowed the Secretary to treat a loss on refinancing by amortizing it over years, but also allowed the Secretary to treat a gain on refinancing by recognizing it entirely in the year in which the gain is recognized under GAAP. Otherwise, the facts are the same.

*Mercy Hospital* first rejected the Secretary's argument that to recognize the full loss in one year would violate the statutory prohibition against cross-subsidization, primarily because there was no evidence in that case that the hospital did not properly allocate the expense, even if it was claimed all in one year, as between Medicare and non-Medicare patients. The same is true in this case. The *Mercy Hospital* court further concluded that other regulations, including particularly 42 C.F.R. § 413.5, should be taken into account. That regulation requires payment to be made on the basis of current costs, and should not disadvantage providers by requiring them to pay out money well before reimbursement is received. Consequently, the court's conclusion was that the regulations, taken as a whole, did not require the Secretary to amortize the cost of refinancing over a period of years, and that to recognize it in one year would not violate any particular regulation.

That, of course, does not answer the precise question posed, which is whether the Secretary may reasonably amortize the cost even though he is not required to do so. In *Mercy Hospital,* the court read the applicable sections of the PRM as dealing only with the reasonableness of refinancing costs and not the timing of reimbursement. Assuming, however, that § 233 was a clarification of the Secretary's position and supported amortization of the costs, the Court concluded, relying upon *Charlotte Memorial Hospital, supra,* that such an approach was "contrary to the applicable regulations and impermissible under the [Administrative Procedure Act]." In conclusion, *Mercy Hospital* held that the Secretary had explicitly promulgated regulations generally applying GAAPs, and that the Secretary could depart from such principles only by promulgating other regulations "providing

for another method of accounting and reimbursement."

*Mercy Hospital* rejected the Secretary's argument that § 413.20 relates only to the record-keeping practices of the hospitals, relying upon the reasoning in *St. Luke's Hospital v. Secretary of Health and Human Services*, 632 F.Supp. 1387, 1391 (D.Mass.1986), *vacated on other grounds*, 810 F.2d 325 (1st Cir.1987), to the effect that a separation between record-keeping requirements and reimbursement procedures is "illogical." That court's interpretation of § 413.20 was that presenting financial records in accordance with GAAPs was mandated precisely because the Secretary fully intended to reimburse institutions under the same procedures, and that to suggest that the Secretary retained discretion to do otherwise is "contrary to the structure of the regulations." *Mercy Hospital*, slip op. at 21. Recognizing *Mercy Hospital* as the strongest decision in support of the Hospital's position, the question becomes whether this court is persuaded by its rationale, or whether there are any significant points in the analysis at which this court and *Mercy Hospital* part company. The court concludes, for the following reasons, that *Mercy Hospital* is not persuasive precedent, and that the Secretary's decision in this case must be upheld because it is a permissible interpretation of the applicable statute and regulations.

*Mercy Hospital* and other cases which have limited the Secretary to the use of GAAPs in the absence of a specific regulation to the contrary all rely on the Ninth Circuit's decision in *Villa View Community Hospital v. Heckler*, 720 F.2d 1086 (1983). That case, however, did not hold that the Secretary was required to rely on GAAPs, because the Secretary did not depart from those principles in that case. The court merely noted in a footnote that the Secretary normally reimbursed costs based upon GAAPs. In the same footnote, the court noted that the Secretary had, by notice published in the Federal Register, specifically reserved the right to reimburse costs differently based upon actual patient care costs if GAAPs did not produce a satisfactory result. *Villa View Community Hospital*, 720 F.2d at 1093 n. 18. The Secretary correctly points out that cases decided after *Villa View*, such as *National Medical Enterprises v. Bowen*, 851 F.2d 291 (9th Cir.1988), *HCA Health Services of Midwest, Inc. v. Bowen*, 869 F.2d 1179 (9th Cir.1989), and *Charlotte Memorial Hospital and Medical Center v. Bowen*, 860 F.2d 595 (4th Cir.1988), all cite to *Villa View* as standing for the principle that the Secretary must, in the absence of regulations to the contrary, apply GAAPs.

Guernsey Hospital argues that, whether *Villa View* stands for the proposition it is often cited for or not, the plethora of cases after *Villa View* which have accepted Guernsey Hospital's position suggests that the position has now become law. Of course, these cases are persuasive only to the extent that their reasoning strikes this court as fundamentally sound. The soundness of their reasoning depends, in turn, on whether they have properly construed the statute and regulations as prohibiting the Secretary from taking the opposite view which, in turn, means that the Secretary's interpretation of the regulations must be manifestly unreasonable. The court does not believe that it is.

The central focus of this analysis is 42 C.F.R. § 413.20. The decisions above have relied heavily upon the apparently mandatory provision that "[s]tandardized definitions, accounting, statistics, and reporting practices that are widely accepted in the hospital and related fields *are followed*." (Emphasis supplied). The title of that section, however, is "Financial Data and Reports," and it appears in Subpart B of the regulations which is entitled "Accounting Records and Reports." The first sentence of Section 413.20(a) clearly refers to the requirement that "providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program." The balance of § 413.20 deals with the frequency with which providers are to supply cost reports, record-keeping requirements for new providers, and continuing provider record-keeping requirements. Subsection (e) permits program payments to be suspended if

a provider does not maintain adequate records. None of the provisions in § 413.-20, however, is either titled in a way that suggests it deals with cost reimbursement principles, or deals specifically with cost reimbursement. General rules of cost reimbursement are set forth in Subpart A of the regulations, and particularly in § 413.5, which lists six general objectives of cost reimbursement. None of the those objectives makes any specific reference to GAAPs, and § 413.5(b)(4) points out that there should be "sufficient flexibility in the methods of reimbursement to be used...." Given the structure of these regulations, the requirement in the statute that the Secretary "consider," but not necessarily follow without deviation, generally accepted accounting principles, and the deference given to the Secretary's interpretation of these regulations, this court cannot say that the Secretary's conclusion that GAAPs need not be followed in all cases is an impermissible interpretation.

The conclusion that the Secretary is not inescapably bound by GAAPs does not, however, mean that every decision to depart from those principles is reasonable. In order for the Secretary's decision to be immune from reversal on grounds that it is arbitrary or capricious, the Secretary must have a permissible rationale for choosing to use some method other than GAAPs to determine when a particular allowable cost is reimbursable. *See, Charlotte Hospital, supra,* which concluded that the specific departure from GAAPs in that case was unreasonable. It is the court's view that the Secretary has a rational basis for concluding that this particular loss should be amortized over the life of the pre-existing debt, and that his departure from GAAPs cannot be considered arbitrary or capricious.

ABP No. 26 was apparently developed as a result of accountants' concerns that similar types of transactions be given similar treatment. For example, if pre-existing debt is cancelled in a particular year by recalling the debt, any costs associated with that transaction are recognized in the year of the recall. In a case such as this, where the debt is not immediately recalled but provisions are made for its repayment in the future, the transaction is treated in the same way. The Secretary concluded, however, that this approach focuses on the immediate reduction in the net worth of the provider from the transaction, but does not focus upon the fact that the benefits of the transaction are spread·out over a number of years. The Secretary has chosen to characterize a transaction such as this one as "an adjustment to the Provider's capital structure" (Tr. 7), but, in terms of its effect on patient care services, the Secretary concluded that "[t]he loss is more closely related to the years over which the original bond term extended...." *Id.* This is also the minority view expressed by the three dissenting members of the Board which adopted ABP No. 26.

The fact that an argument can be made for amortizing this particular loss, and that there was some disagreement even among those accountants who promulgated GAAPs, convinces the court that the Secretary did not act in an arbitrary or capricious manner in choosing to follow the minority viewpoint. The Secretary also argues, of course, that to recognize the entire loss in the year of refinancing would violate the "cross-subsidization" principles of the Medicare Act. That argument was considered and rejected in the *Mercy Hospital* decision, and the court need not consider it here. It is enough to say that the Secretary has a rational basis for concluding that, by amortizing this particular cost, he has more closely approximated the impact of the transaction upon the provider's cost of patient care. If the evidence of record suggested that rational accountants could not disagree on this point, and that the only possible way of treating this cost was to recognize it in full in the year in which it was incurred, the Secretary's decision might be said to be arbitrary. That is not this case, and the court is not free to substitute its view for that of the Secretary when the Secretary has not acted irrationally. For these reasons, the court concludes that the Secretary's decision as to the first issue, the timing of the recognition

of the loss incurred as a result of the 1985 refinancing, must be affirmed.

### B. *The Debt Service Fund Issue*

■ The nature of this issue is relatively straightforward. Obviously, Guernsey Hospital is required to make repayments both of principal and interest on the new bonds. Two separate accounts have been set up to accumulate funds for such repayment. One is to be used exclusively for accumulation of money to repay capital, and the other is to be used to accumulate money to repay interest.

Under regulations now found at 42 C.F.R. § 413.134(e), the Secretary strongly recommends funding of depreciation. As an incentive, § 413.134(e)(1) provides that "investment income on funded depreciation is not treated as a reduction of allowable interest expense." § 413.134(e)(2)(i) states that the Secretary considers funded depreciation available "for use in the acquisition or replacement of depreciable assets related to patient care" or "for other capital purposes related to patient care." Section 413.134(e)(3) defines proper and improper withdrawals from funded depreciation, distinguishing between proper withdrawals, which are made for the acquisition or replacement of depreciable assets or for other capital purposes related to patient care, and improper requirements, which are all other withdrawals. If an improper withdrawal is made, regulations require that appropriate adjustments be made in any previously-permitted exemption of the earnings from reducing allowable interest expense.

In this case, the Secretary treated the principal account as a funded depreciation account, since it was being used to repay the principal of obligations which were used to purchase depreciable assets relating to patient care. The Secretary concluded, however, that the interest account was not entitled to similar treatment, because it was simply being used to pay interest on that capital obligation. Guernsey Hospital contends that the interest on the obligation is being accumulated and paid "for other capital purposes relating to patient care"

because it is so closely associated with the debt itself. The PRRB apparently adopted this argument, relying on a previous board decision concluding that a single debt service fund which was used to pay both interest and principal met the requirements of a funded depreciation account. Seeing no practical difference between a single fund and separate accounts, the Board concluded that the earned interest should not be used as an offset against otherwise allowable interest expense. The administrator, relying on the language of the regulations and a decision in *Good Samaritan Hospital v. Blue Cross Association/Mutual Hospital Insurance, Inc.*, PRRB Decision No. 79–D80 (November 26, 1979), *aff'd* HCFA Admin. Decision (January 23, 1980), reversed. The parties' arguments in this court are the same as those advanced below.

Again, the court must determine whether the Secretary's decision to refuse to recognize the interest account as a funded depreciation account is arbitrary, capricious, or otherwise not in accordance with law. The applicable regulations, of course, appear to allow for some flexibility, permitting an account to be so regarded when it is used either for the accumulation of funds to purchase depreciable assets related to patient care or for "other capital-related purposes" so related. The Secretary concluded that repayment of the principal amount of borrowing which was used to purchase depreciable assets was a "capital-related purpose." The question becomes whether interest on that same obligation is necessarily a "capital-related purpose" or whether the Secretary could, without running afoul of the regulations, properly characterize it as something else.

Again, this is an area where the Secretary's decision, in order to be reversed by this court, must possess an element of arbitrariness. It appears that reasonable minds could differ as to whether the interest being repaid was strictly for a "capital-related purpose" or whether it was simply an ordinary interest expense on borrowed funds. The only decision in the record which appears to relate to this issue is the *Good Samaritan* decision cited above. In that case, a "Lease Reserve Account"

which accumulated money to be used to repay borrowing was treated as a funded depreciation account, although there existed the possibility that some of the money would be used to pay interest on that borrowing. The Secretary concluded that the existence of that possibility, alone, did not disqualify the interest earned on the fund from favorable treatment, but also stated that if a withdrawal from the fund was used for an improper purpose, such as the payment of interest, a retroactive adjustment would be required.

*Good Samaritan* is consistent with the position taken by the Secretary in this case. There, because it was unclear whether the money in the Lease Reserve Account which had been established would be used to pay interest or principal, the Secretary chose to wait until withdrawals were made and to make appropriate adjustments at that time depending upon the purpose for which the funds were used. Here, by contrast, the interest account was established for the sole purpose of paying interest on the refunding bonds. Guernsey Hospital has not suggested that the funds could properly be used for any other purpose. Under those circumstances, the Secretary need not wait until withdrawals are made in order to identify the purpose of the money, and then make a retroactive readjustment. Rather, he can determine now that the funds will be used only to pay interest. The court is not convinced that the Secretary acted arbitrarily or in violation of any applicable regulation by refusing to consider this interest-only account as sufficiently related to a capital expenditure for patient care purposes as to mandate that it receive the same favorable treatment which is offered as an incentive to hospitals to fund depreciation on capital assets. That being so, the Secretary's decision on this issue will be affirmed as well.

### IV.

Based upon the foregoing, the motion of plaintiff, Guernsey Memorial Hospital, for summary judgment, is DENIED. The motion of the defendant, Louis W. Sullivan, M.D., Secretary of Health and Human Services, is GRANTED. The Clerk is directed to enter judgment in favor of the defendant.